GULF STATES.G 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-173-CV





GULF STATES UTILITIES COMPANY,



 APPELLANT


vs.





PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,




 APPELLEES



 



FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT



NO. 411,817, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING


 





 Gulf States Utilities Company ("Gulf States") appeals a district court judgment
affirming a decision of the Public Utility Commission (the "Commission") disallowing Gulf
States' recovery of energy capacity costs arising under a series of energy contracts with the
Southern Company ("Southern"), a utility holding company. The Commission disallowed Gulf
States' capacity costs after determining that they had been imprudently incurred. The district
court affirmed the Commission's order; we will affirm the district court's judgment.



THE CONTROVERSY


A Summary of the Dispute.

 This dispute arises from Gulf States' decision to contract with Southern for the
long-term supply of energy and energy capacity. In exchange for this long-term supply, Gulf
States agreed to multi-billion dollar payments over an eight-year period. After entering into these contracts, Gulf States petitioned the Commission for a retail-rate increase, hoping to pass
through to its retail customers the contracts' energy and capacity costs. The Commission allowed
Gulf States to recover its energy costs but denied the recovery of its capacity costs, ruling that
Gulf States had not acted prudently in incurring them. The Commission based its ruling on
findings that Gulf States knew or should have known at the time it entered the contracts that it did
not need the Southern capacity in order to meet its future requirements and that the utility failed
to explore alternative sources of energy. Gulf States sued in district court for judicial review of
the Commission's order, which the court affirmed. In this appeal, Gulf States contends the
Commission (1) lacked jurisdiction to pass upon the "prudence" of the company's decision to
purchase the Southern power; (2) violated the Commerce Clause in arriving at its final order; (3)
arbitrarily and capriciously ignored key evidence; (4) failed to apply res judicata to earlier
Commission orders; (5) applied an incorrect legal standard of "prudence"; and (6) erroneously
shifted the parties' burdens of proof when determining the prudence of the Southern purchases. 


 

The Relevant Details.

 Gulf States is an investor-owned utility engaged in generating, transmitting,
distributing, and retailing electric energy throughout southeast Texas and south-central Louisiana. 
Before 1982, Gulf States primarily used natural gas to fuel its generators. However, in the late
1970s and early 1980s, the company began to construct coal-fired and nuclear-fired power plants
in an effort to decrease its reliance on natural gas in generating electric power. Gulf States also
determined that it would not be able to generate sufficient energy to meet its customers' demands
during the 1980s and decided to purchase additional power on the open market.

 In February 1982, Gulf States contracted with Southern (1) to purchase coal-fired
energy and capacity, agreeing to pay both energy charges and capacity charges in exchange for access to large quantities of energy. Because this dispute centers on capacity charges, we pause
to explain how these differ from the energy charges that the Commission allowed Gulf States to
recover.



The price of any purchase of electric power is made up of an energy component,
the variable costs associated with the production of electric energy (primarily the
cost of fuel and some operating and maintenance expenses), and a capacity
component, costs associated with providing the capability to deliver energy
(primarily the capital costs of facilities).

 

Pennsylvania Power Co. v. Pennsylvania Pub. Serv. Comm'n, 561 A.2d 43, 46 n.4 (Pa. Commw.
Ct. 1989), aff'd, 587 A.2d 312 (1991). 

 The capacity charges were calculated as a percentage of Southern's fixed investment
for plant construction costs, corresponding to the portion of the facilities dedicated to producing
Gulf States' purchase of the plant's generating potential. The energy charges reflected the cost
of fuel and other variables associated with producing the energy. These contracts covered the
period from 1984 to 1992 and required Gulf States to purchase 500 megawatts of capacity. In
May 1982, Gulf States contracted with Southern for an additional 500 megawatts of capacity. 
Gulf States agreed to a 100% take-or-pay commitment for this capacity and a 50% take-or-pay
commitment for purchased energy. 

 In August 1982, the Commission issued Gulf States a certificate of convenience and
necessity to construct a transmission line to deliver the Southern energy to Gulf States' facilities. (2) 
In October 1985, Gulf States filed with the Commission a statement of intent to increase its retail
rates in order to pass through to its consumers the costs of the Southern purchase. See Public
Utility Regulatory Act., Tex. Rev. Civ. Stat. Ann. art. 1446c, § 43(a) (West Supp. 1992)
("PURA"). The Commission assigned this request Docket No. 6525 and scheduled a hearing for
March 17, 1986.

 The opponents (3) to the rate increase claimed that Gulf States failed to bargain for
advantageous terms. They complained specifically of the contracts' take-or-pay clauses, which
had no "market out" exceptions, and of the more expensive energy rates predicated upon
Southern's use of newer, more costly generators. These opponents argued that the Southern
contracts were so unfavorable that Gulf States never should have entered into the agreements. 
After seven weeks of hearings, the parties recessed for settlement negotiations and eventually
entered into a stipulation that resolved most of the disputed issues. 

 In June 1986, the Commission reconvened to deal with the unresolved issues,
specifically whether Gulf States could pass through the capacity charges to its retail customers. 
The hearing examiner ruled that Gulf States had failed to demonstrate prudent decision-making
in entering into the contracts to purchase large quantities of energy capacity and therefore should
not be allowed to recoup its capacity charges as part of the requested rate-increase. The
Commission, with one dissent, accepted this recommendation, found that Gulf States had acted
imprudently, and disallowed the capacity charges. The district court affirmed the Commission's
order. 



JURISDICTIONAL CHALLENGES


 In three points of error, Gulf States has challenged the Commission's jurisdiction
to disallow recovery of the Southern capacity charges in the utility's rate increase. In these
points, Gulf States makes five distinct claims:



 FERC (4) previously determined the prudence of Gulf States' decision to
purchase the Southern capacity;


 FERC exercises exclusive jurisdiction to review the prudence of purchases of
wholesale electric power;


 Disallowance of Gulf States' capacity costs constitutes impermissible
"trapping" and violates the "filed rate" doctrine;


 The Commission lacks jurisdiction to review the particular terms of these
contracts; and


 The Commission's order impermissibly burdens interstate commerce.

 


The first four claims implicate federal preemption principles arising under the Supremacy Clause; (5)
the remaining claim implicates the Commerce Clause. (6) 

 Gulf States' jurisdictional challenge requires us to examine the evolving
"jurisdictional tug-of-war" between state and federal regulation of the electric utility industry. See
Clinton A. Vince & John S. Moot, Federal Preemption versus State Utility Regulation in a Post-Mississippi Era, 10 Energy L. J. 1, 3 (1989). We are asked to determine if the growing federal
preemption of energy regulation precludes a state regulatory commission, in its traditional role
of setting retail energy rates, from reviewing the prudence of a utility's purchase of capacity at
FERC-approved rates. This is an issue of first impression in Texas that requires us to review the
historical development of state and federal regulation of the electric utility industry. 


 

The Historical Context.

 Before 1935, no federal agency existed to regulate the electric utility industry;
instead, various state public service commissions performed this function. See Vince & Moot,
supra, at 9. In 1927, the Supreme Court invalidated a state commission's attempt to regulate a
utility's interstate sales and transmissions of electricity. See Public Utils. Comm'n v. Attleboro
Steam & Elec. Co., 273 U.S. 83, 88-90 (1927). The Court reasoned that, under the Commerce
Clause, Congress alone possessed the authority to regulate interstate transmissions of electricity. 
Id. at 90. After Attleboro, states could continue to regulate retail electric-power sales and rates,
but could not regulate wholesale transmissions of electric energy in interstate commerce. See
Federal Power Comm'n v. Southern Cal. Edison Co., 376 U.S. 205, 213 n.8 (1964). 

 Attleboro revealed a "gap" in the regulatory oversight of electric utilities: although
Congress retained the exclusive authority to regulate interstate transmissions of power, no federal
agency had been given these responsibilities. In 1935, Congress enacted the Federal Power Act,
16 U.S.C.A. §§ 791a-828c (West 1985 & Supp. 1992) ("Federal Power Act" or "FPA"), to fill
this regulatory void. Its intent was



to "fill the gap"--the phrase is repeated many times in the hearings, congressional
debates and contemporary literature--left by Attleboro in utility regulation. 
Congress interpreted that case as prohibiting state control of wholesale rates in
interstate commerce for resale, and so armed the Federal Power Commission with
precisely that power.

 


United States v. Public Utils. Comm'n, 345 U.S. 295, 307-08 (1953); see also Frank R. Lindh,
Federal Preemption of State Regulation in the Field of Electricity and Natural Gas: A Supreme
Court Chronicle, 10 Energy L.J. 277, 285-86 (1989). The FPA created the Federal Power
Commission (now FERC) to regulate wholesale transmissions and sales of energy in interstate
commerce. FPA §§ 792, 824(a).



The "Bright Line": Federal versus State Regulation.

 The Supreme Court has characterized the Federal Power Act as a Congressional
attempt to establish a "bright line" between state and federal jurisdiction over utility regulation. 
See Southern Cal. Edison Co., 376 U.S. at 215-16. This bright-line analysis has proved useful
in challenges to state jurisdiction brought under both the Commerce and Supremacy Clauses; (7) it
permits courts to focus upon the interstate distinction as well as the wholesale or retail nature of
the transactions involved. 



The "Filed Rate" Doctrine.

 In their regulation of retail rates, states may not challenge federally approved
wholesale rates as unreasonable. In Montana-Dakota Utilities Co. v. Northwestern Public Service
Co., 341 U.S. 246, 251-52 (1951), the Court pronounced the "filed rate" doctrine: the utility rate
filed with and approved by FERC is the only reasonable wholesale rate. One federal circuit court
has elaborated on the doctrine:



The purchaser's right to a reasonable wholesale rate is the right to the rate which
the Commission [FERC] files or fixes. Except for a narrow review of the
Commission's orders, the court can assure no right to a different rate on the
ground that, in its opinion, another rate is the only or more reasonable one.

 


Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n, 837 F.2d 600, 606 (3rd Cir.),
cert. denied, 488 U.S. 941 (1988) (discussing Montana-Dakota Utilities). 



The Narragansett and Pike County Doctrines.

 The filed rate doctrine restricts state regulation of the electric utility industry. The
Rhode Island Supreme Court examined the interplay between this doctrine and state regulatory
practices in Narrangansett Electric Co. v. Burke, 381 A.2d 1358 (R.I. 1977), cert. denied, 435
U.S. 972 (1978). That court held that the state regulatory commission could not review the
reasonableness of FERC-approved wholesale rates and must treat the FERC rates as reasonable
operating expenses when establishing a utility's costs of retail service. See id. at 1363. Because
FERC exercises exclusive jurisdiction to determine "just and reasonable" rates for wholesale sales
of electric power in interstate commerce, see FPA § 824d(a), federal preemption principles
preclude state regulatory practices that effectively challenge the reasonableness of FERC-set rates. 
See Narragansett, 381 A.2d at 1361; see also Northern States Power Co. v. Minnesota Pub. Utils.
Comm'n, 344 N.W.2d 374 (Minn.), cert. denied, 467 U.S. 1256 (1984); Eastern Edison Co. v.
Department of Pub. Utils., 446 N.E.2d 684 (Mass. 1983); Northern States Power Co. v. Hagen,
314 N.W.2d 32 (N.D. 1981). 

 A Pennsylvania decision crafted an exception to the preemption doctrine of
Narragansett. In Pike County Light and Power Co. v. Pennsylvania Public Utility Commission,
465 A.2d 735 (Pa. Commw. Ct. 1983), the court noted that although FERC exercises exclusive
jurisdiction to set just and reasonable rates, FERC "makes no determination of whether it is just
and reasonable for Pike [the utility company] to incur such a rate as an expense." Id. at 738
(emphasis in original). 

 According to Pike County, FERC has statutory jurisdiction under the Federal
Power Act to determine whether the seller's rates are just and reasonable and in the public interest
in considering the seller's costs. See id; see also FPA § 824d(a). But the Act does not charge
FERC with examining the prudence of the purchaser's decision to obtain power from this source. 
Therefore, the preemption doctrine of Narragansett does not deprive a state commission of
jurisdiction to review a utility's decision to purchase power from a particular source at a particular
price in light of alternative sources. See Pike County, 465 A.2d at 738. While Narragansett
would foreclose a state's review of the reasonableness of FERC-approved wholesale rates, Pike
County permits "state commissions [to] inquire into the prudence of the retail utility's purchasing
decisions in determining whether to allow the utility full recovery of its purchase power costs in
its retail costs of service." See Vince & Moot, supra, at 22. 



The Present Controversy.

 Gulf States claims that federal preemption principles deprive the Commission of
jurisdiction to review the prudence of Gulf States' capacity costs after FERC approved the rates
governing the wholesale transaction between Southern and Gulf States. Gulf States also relies on
the Supreme Court's holding in Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487
U.S. 354 (1988), to argue that FERC exercises exclusive jurisdiction to review a purchaser's
prudence and to maintain that Pike County and its progeny enjoy no continuing vitality. 

 The Commission relies on Pike County to exercise its review of Gulf States'
prudence in incurring the capacity charges at issue here. It argues that Mississippi Power & Light does not foreclose the Pike County doctrine and does not divest the Commission of
jurisdiction to review the prudence of Gulf States' purchase of capacity.



 Did FERC determine that Gulf States was prudent in purchasing the Southern
capacity? 



 In Southern Company Services, Inc., 26 FERC ¶ 61,360, at 61,796 (1984), FERC
described the rates at which Southern sold capacity to Gulf States as "just and reasonable and in
the public interest." Gulf States argues that this characterization of the wholesale rates constitutes
a finding that Gulf States prudently incurred the capacity costs and preempts the Commission's
prudence inquiry during subsequent retail-rate hearings. We disagree. 

 Section 824 of the FPA expressly grants FERC jurisdiction to regulate sales of
wholesale power in interstate commerce; FERC's inquiry focuses on the rate at which sellers
market their power. FERC does not review the market conditions or other factors that govern the
prudence of the purchaser's decision to buy power in the wholesale transaction. FERC
specifically deferred consideration of Gulf States' prudence to a future rate hearing:



[T]he question of the prudence of a utility's power purchases is properly an issue
in the buying utility's rate case where it seeks to pass the costs of its purchased
power on to its ratepayers. If and when Gulf States makes a rate filing reflecting
its costs under these contracts, any interested party may intervene and challenge
those costs.

 


Southern Co. Servs., Inc., 26 FERC ¶ 61,360, at 61,795. By approving Southern's wholesale
rates as just and reasonable, FERC did not implicitly find that Gulf States was prudent in
purchasing the Southern capacity.



 Does FERC exercise exclusive jurisdiction to review the prudence of purchases
of wholesale electric power?



 Whether or not FERC actually examined the prudence of Gulf States' purchases
of capacity from Southern, Gulf States claims that FERC has exclusive jurisdiction to do so and consequently, the Commission may not exercise this jurisdiction. (8) This preemption argument goes
to the heart of the jurisdictional tug-of-war between the federal and state regulation of electric
utilities.

 "[T]he regulation of utilities is one of the most important of the functions
traditionally associated with the police power of the States." Arkansas Elec. Coop. Corp. v.
Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377 (1983). PURA empowers the Commission to
set just and reasonable retail rates. See PURA § 38. A rate cannot be deemed just and reasonable
unless the utility was prudent in incurring the operating expenses it seeks to pass through to
consumers. (9) Our state regulatory scheme grants the Commission jurisdiction to review the
prudence of Gulf States' operating expenses when the utility seeks a rate increase. 

 Congress created a federal regulatory scheme to fill the void that Attleboro
identified in the regulation of the electric utility industry's interstate transactions. The Act
provides for federal regulation of transmissions and wholesale sales of electric power in interstate
commerce. See FPA § 824(a). Its declaration of policy states that "such Federal Regulation,
however, [is] to extend only to those matters which are not subject to regulation by the States." 
Id. The federal government's jurisdiction "was to complement that of the state regulatory bodies." 
Federal Power Comm'n v. Panhandle E. Pipe Line Co., 337 U.S. 498, 503 (1949).

 But Gulf States asserts that federal jurisdiction now preempts the states' traditional
authority to review a utility's prudence in incurring the operating expenses it seeks to include in
retail rates. Preemption is a disfavored doctrine. See Chicago & N.W. Trans. Co. v. Kalo Brick
& Tile Co., 450 U.S. 311, 317 (1981). Generally speaking, federal law may preempt state law
in three ways: (1) Congress may express its intent to preempt state law; (2) Congress may merely
signal an intent to occupy an area; and (3) a state law may be automatically preempted because
it conflicts with a federal law. New Orleans Pub. Serv. Inc. v. Council of New Orleans, 911 F.2d
993, 998 (5th Cir. 1990), cert. dismissed, 112 S.Ct. 411 (1991) (citing Michigan Canners &
Freezers Ass'n, Inc. v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469 (1984)). We
detect nothing in the Federal Power Act that would foreclose the state's jurisdiction to review a
utility's prudence in incurring operating expenses when the utility seeks a rate increase.

 Gulf States argues, however, that in Mississippi Power & Light the Supreme Court
has "laid to rest any doubt that FERC's authority extends to the purchaser's side of wholesale
electric transactions," and that "FERC cannot tenably disclaim jurisdiction over purchaser
prudence after Mississippi Power & Light." We disagree. While Mississippi Power & Light does
recognize FERC's jurisdiction to review a purchaser's prudence in certain situations, it does not
hold that all wholesale purchases are subject to FERC's exclusive jurisdiction, and it does not
govern the issue presented in this case. 

 Mississippi Power & Light involved Mississippi's attempts to circumvent FERC's
allocation of construction costs for the Grand Gulf nuclear power plant. Middle South Utilities
(Middle South), a public utility holding company, began construction of Grand Gulf, a plant
designed to provide power for each of Middle South's four operating subsidiaries, which had
formed a FERC-approved integrated pooling arrangement. By virtue of this power pool, the
subsidiaries sold wholesale power to each other and to other outside companies for resale and also
engaged in retail sales of power throughout Louisiana, Arkansas, Missouri, and Mississippi.

 Grand Gulf's construction costs exceeded the initial estimate six-fold, dramatically
increasing Middle South's completion costs. FERC revised, and ultimately approved, Middle
South's operating agreement allocating Grand Gulf's capacity costs to the four subsidiaries in
varying percentages. The operating agreement served to distribute the pain of Grand Gulf's
increased construction costs among the affiliated pool-members. Because Grand Gulf had been
constructed to serve the collective needs of all the pool participants, FERC allocated the plant's
construction costs among the pool members in accordance with their share of the plant's
generating capacity.

 Some of the individual affiliates then attempted to pass through these allocated
capacity costs to their respective retail customers. Mississippi Power & Light ("MP&L")
successfully obtained a retail rate increase that allowed it to recoup its share of Grand Gulf's
capacity charges, as determined by FERC. The Mississippi Supreme Court overturned the state
commission's order, holding that the commission erred in approving a rate increase without first
determining that MP&L's capacity expenses were prudently incurred. State ex rel. Pittman v.
Mississippi Pub. Serv. Comm'n, 506 So.2d 978, 986-87 (Miss. 1978). The Mississippi court
noted that FERC had not addressed the prudence of MP&L's participation in the Grand Gulf
project, and consequently, Mississippi was not precluded from reviewing this issue.

 The United States Supreme Court reversed, holding that the state commission was
preempted from reviewing the prudence issue:



The [commission] cannot evaluate either the prudence of MSU's decision to invest
in Grand Gulf and bring it on line or the prudence of MP&L's decision to be a
party to agreements to construct and operate Grand Gulf without traversing matters
squarely within FERC's jurisdiction.



Mississippi Power & Light, 487 U.S. at 376. 

 It is critical to our inquiry today to understand why the Supreme Court determined
that FERC had jurisdiction to determine the purchaser-prudence issue, an inquiry traditionally
performed by the states in their rate-making process. Mississippi Power & Light suggests that
FERC's jurisdiction to review particular purchaser-prudence issues arose from its exclusive
jurisdiction to review the operating agreements governing an integrated power pool. 

 MP&L was a participant in a power pool consisting of all of Middle South's
operating affiliates. Each affiliate member purchased and sold wholesale electric power. See
Mississippi Power & Light, 487 U.S. at 357. Middle South's operating agreement was subject
to FERC's review because it involved the sale of wholesale power among the affiliate members. 
See FPA § 824. Applying federal preemption principles, FERC exercised exclusive jurisdiction
to review the reasonableness of the wholesale rates. Id. at § 824d.

 The Mississippi court's order to review all transactions between MP&L and the
holding company to determine their effect on operating expenses was invalid because the
transactions to be reviewed



comprise the very Systems Agreements between MSU and the operating companies
and UPSA [Unit Power Sales Agreement] evaluated by FERC in the exercise of
its jurisdiction over wholesale rates. The MPSC [commission] lacks jurisdiction
to reevaluate the reasonableness of those transactions.

 


Id. (emphasis added). Only FERC may evaluate the agreements governing members of an
integrated power pool; the state may not reevaluate the reasonableness of those wholesale
transactions. Id. Therefore, a state regulatory commission may not review the prudence of a
purchaser's participation in an integrated operating arrangement involving wholesale and retail
transmissions between pool members. 

 In American Electric Power Service Corp., 32 FERC ¶ 61,363 (1985), a
municipality and a state agency intervened to ask FERC to refrain from considering whether pool
members were wise or prudent in entering into the pooling agreement. Id. at 61,814. FERC
declined to limit its review:



 Transmission and allocation of the costs of the AEP [pool] transmission
network are integral parts of the operation of the AEP pool. Therefore, the
prudence of being a party to the . . . transmission agreement cannot be considered
separately from the prudence of being a party to the entire AEP pool relationship. 
A challenge to the membership in a public utility holding company power pool of
a member of the holding company is a federal matter . . . .

 

 Moreover, a state commission could not review the prudence of an AEP
operating company in entering into the . . . transmission agreement without
invading our jurisdiction by ruling to some extent on the merits of the agreement
itself. . . . For a state commission to decide such questions for itself would be an
invasion of our exclusive jurisdiction over the . . . transmission agreement. 
Commission [FERC] precedent leaving to the state commissions the question of the
prudence of an operating company in making a particular purchase is not
applicable under the facts of this case.

 


Id. at 61,818 (emphasis added). See also American Elec. Power Serv. Corp., 37 FERC ¶ 61,001
(1986); AEP Generating Co., 36 FERC ¶ 61,226 (1986). This decision illustrates the rationale
announced later in Mississippi Power & Light that FERC has exclusive jurisdiction to review the
prudence of a pool member's participation in a pooling arrangement that involves buying and
selling energy at wholesale rates.

 Although Mississippi Power & Light recognizes FERC's exclusive jurisdiction to
review the prudence of entering into certain transmission agreements, it does not establish FERC's
exclusive jurisdiction to determine the prudence of every wholesale purchase of electric power. 
Here, Gulf States is not a participant in an integrated pooling arrangement which might invoke
FERC's exclusive jurisdiction. Nor is Gulf States transmitting or selling wholesale electric power
in exchange for the Southern capacity, conditions which would subject it as a seller to FERC's
exclusive jurisdiction. Unless the purchaser is also a seller of wholesale power or a member of
an operating arrangement subject to FERC regulation, FERC has no statutory authority to review
the prudence of the purchaser's expenses or the reasonableness of the purchaser's decision to
participate in the project. See Mississippi Power & Light, 487 U.S. at 376.

 FERC has noted this limitation on its jurisdiction. In Monongahela Power Co.,
et al., 39 FERC ¶ 61,350, at 62,094-95 (1987), FERC was asked to review the Potomac Electric
Power Company's ("PEPCO's") purchase of 450 megawatts of energy and related capacity from
the Allegheny Power System ("APS"). PEPCO was under no preexisting obligation to purchase
this capacity due to a pooling arrangement or integrated corporate structure. Intervenors
challenged FERC's jurisdiction to review the prudence of an unaffiliated operating utility's
purchase from a holding company. FERC recognized its lack of jurisdiction to evaluate an
unaffiliated purchaser's prudence under these circumstances:




Given PEPCO's status as a purchaser not affiliated with . . . APS and not under
any preexisting obligation under the terms of any interconnection agreement,
power pool, or other highly integrated contractual or corporate arrangement to
make this purchase, we do not have jurisdiction in this proceeding over the
question of whether PEPCO was prudent in entering into this transaction.

 


Id. at 62,095 (citing Pike County). See also Southern Co. Servs., Inc., 26 FERC ¶ 61,360; PSI
Energy, Inc., 55 FERC ¶ 61,254, at p.61,810-11 n.18 (1991); Palisades Generating Co., 48
FERC ¶ 61,144, at p. 61,574-75 (1990).

 Even after Mississippi Power & Light, FERC will probably continue to disclaim
jurisdiction to inquire into a purchaser's prudence in entering into an agreement not dictated by
pooling arrangements or corporate integration. FERC's recognition that it lacked jurisdiction in
this case to review Gulf States' prudence (10) is entirely consistent with the Federal Power Act and
Mississippi Power & Light. Under the circumstances of this case, federal preemption does not
preclude the Commission's review of Gulf States' prudence in contracting to purchase this
quantity of energy capacity from Southern in light of its projected needs and considering its
alternative sources of power.



 Did the Commission's disallowance of Gulf States' capacity costs constitute
impermissible "trapping"?



 Gulf States argues that the Commission violated the filed rate doctrine by failing
to allow as a reasonable operating expense recovery of the costs incurred in paying a FERC-determined wholesale price. See Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 964-65 (1986); (11) Narragansett, 381 A.2d at 1363. The utility characterizes the disallowance of this
operating expense as "trapping," an impermissible state regulatory action. See Mississippi Power
& Light, 487 U.S. at 372; see also Nantahala, 476 U.S. at 970-71. The Commission responds
that Pike County and its progeny permit the Commission to review the wisdom of Gulf States'
initial decision to purchase Southern capacity. 

 In its findings of fact, the Commission determined that "Gulf States did not need
any of the capacity it obtained under the Southern contracts and did not appropriately evaluate the
desirability of entering into such contractual commitments versus other alternatives . . . ." Finding
of Fact No. 67. This finding focuses solely on purchaser prudence, as Pike County permits a state
regulatory commission to do. The Commission did not challenge FERC's wholesale rates by
manipulating FERC-ordered allocations or second-guessing the reasonableness of other factors
previously approved by FERC.

 Mississippi Power & Light and Nantahala indicate that impermissible trapping
occurs when FERC mandates a particular rate or quantity of power and the state commission
refuses to allow the utility to recoup that mandated expense in its retail rates. See Mississippi
Power & Light, 487 U.S. at 372; Nantahala, 476 U.S. at 971-72. Both decisions involved FERC-mandated allocations of power; the utility companies had no choice but to purchase the quantities
that they were allocated. Mississippi Power & Light, 487 U.S. at 374; Nantahala, 476 U.S. at
970-71. In our present situation, FERC made no allocations; Gulf States was under no obligation
to purchase any quantity of power from Southern.

 If a utility has a choice to purchase a particular quantity of power at a particular
price, the state may properly review the utility's prudence in incurring that expense. Compare
Kentucky W. Va. Gas Co., 837 F.2d at 609 (FERC approval does not mandate pass-through of
actual costs where utility had option to purchase wholesale gas at lower rate) with Kentucky W.
Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n, 862 F.2d 69, 74 (3d Cir. 1988) (state
commission's disallowance of costs improper where costs are FERC-mandated). A state's refusal
to pass through to consumers unreasonable capacity costs voluntarily incurred by a utility is not
impermissible trapping; it is the exercise of a discretion necessary and proper to meaningful retail
rate-making. To hold otherwise would effectively end state regulation of retail sales that involve
any wholesale purchases of power at FERC-set rates. If FERC declined to review the purchaser's
prudence, as it has in some circumstances, we would be creating another regulatory void. Federal
preemption principles do not require total emasculation of the states' traditional role in setting
reasonable retail rates to protect the ultimate consumers of electric power.

 In a case decided after Mississippi Power & Light and Nantahala, the Supreme
Court has signalled that preemption principles do not always preclude state or local jurisdiction
to conduct prudence reviews in situations involving FERC-mandated allocations and FERC-set
rates. In New Orleans Public Service, Inc. v. Council of the City of New Orleans, 491 U.S. 350
(1989), the Court reviewed a federal-abstention issue within the context of a utility's attempts to
pass through its FERC-mandated allocation of a nuclear plant's costs. The City Council of New
Orleans (the "Council") had challenged New Orleans Public Service, Inc.'s ("NOPSI's") request
for an immediate rate increase. NOPSI sought to pass through to consumers its FERC-allocated
share of costs involving the same Grand Gulf power plant at issue in Mississippi Power & Light. 
The Council disallowed an immediate pass through of NOPSI's capacity costs and announced that
it would review the wisdom of NOPSI's failure to diversify its portfolio after the risk of nuclear
power became apparent. The Council specifically provided, however, that in determining
appropriate retail rates, it would not invalidate any of the Grand Gulf agreements nor would it
order NOPSI to pay any wholesale rates other than those approved by FERC. Id. at 356.

 Though its holding was tied to the abstention issue, the Court noted that



[t]he Council has not sought directly to regulate interstate wholesale rates; nor has
it questioned the validity of the FERC-prescribed allocation of power within the
Grand Gulf System, or the FERC-prescribed wholesale rates; nor has it
reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in
the first place. Rather, the Council maintains that it has examined the prudence of
NOPSI's failure, after the risk of nuclear power became apparent, to diversify its
supply portfolio and that finding that failure negligent, it has taken the normal
ratemaking step of making NOPSI's shareholders rather than the ratepayers bear
the consequences. Nothing in this is directly or even indirectly foreclosed by the
federal statute, the regulations implementing it, or the caselaw applying it. There
may well be reason to doubt the Council's necessary factual finding that NOPSI
would have saved money had it diversified. But we cannot conclusively say it is
wrong without further factual inquiry. . . .



Id. at 367. On remand, the Fifth Circuit ruled that federal law did not preempt the Council's
prudence review and its resulting order. See New Orleans Pub. Serv. Inc., 911 F.2d at 1002.

 The NOPSI decisions validate state review of costs that a purchaser voluntarily but
imprudently incurs in a wholesale transaction involving FERC-set rates. The decisions support
a state or local regulatory agency's refusal to pass through to consumers certain imprudently
incurred operating expenses. Such a rate-making decision will not be labelled an impermissible
trapping. Although the disallowed costs will be trapped, the trapping is not impermissible unless
FERC mandated the utility's decision to incur the costs. By disallowing Gulf States' voluntarily
incurred capacity costs, the Commission has not impermissibly trapped the capacity costs.



 Did the Commission impermissibly review the particular terms contained in
the Southern contracts?



 Gulf States claims that the Commission's order is based upon an impermissible
review of the specific terms of its contracts with Southern. The utility argues that by disallowing
the capacity costs, the Commission has effectively ruled that the terms of the purchase were
unreasonable. This, says the utility, constitutes an infringement of FERC's exclusive jurisdiction
to review the terms of agreements governing wholesale transmissions of energy. Gulf States
mischaracterizes the scope of the Commission's review, and we reject its claim that the
Commission encroached upon FERC's jurisdiction. 

 FERC's jurisdiction encompasses wholesale rates and power allocations affecting
those rates, as well as purchaser-prudence issues arising in the context of integrated pooling
agreements or sales between corporate affiliates. See FPA §§ 824, 824d; Mississippi Power &
Light; Nantahala. We have already determined that FERC did not review Gulf States' prudence
in buying energy from Southern and that FERC did not require Gulf States to purchase any
particular quantity of energy. The remaining question is whether the Commission's disallowance
of Gulf States' capacity costs directly or indirectly challenged FERC's exclusive jurisdiction over
wholesale rates.

 We conclude that the Commission's order does not challenge FERC's determination
that Southern's wholesale rates were just and reasonable. The Commission found that "Gulf
States did not need any of the capacity it obtained under the Southern contracts. . . ." Finding
of Fact No. 67 (emphasis added). To argue that the Commission impermissibly challenged
FERC-set rates, Gulf States must add several words to this finding that are not there: "Gulf States
did not need any of the capacity it obtained under the Southern contracts at the rate specified." 
But the Commission's factfinding does not challenge the reasonableness of FERC's wholesale
rates; it challenges Gulf States' reasonableness in analyzing its energy needs. 

 Gulf States points to the Commission's finding that the utility "was imprudent in
its failure to seek more favorable terms when it was negotiating with Southern to purchase the
1,000 MW of Southern power." Finding of Fact No. 76. But this finding does not, in itself,
illustrate any jurisdictional infringement. The Federal Power Act does not grant FERC exclusive
jurisdiction over the reasonableness of all contract provisions submitted for FERC review. FERC
acknowledged this when it stated:



We do not view our responsibilities under the Federal Power Act as including a
determination that the purchaser has purchased wisely or has made the best deal
available. However, these are legitimate concerns of the state commissions and
this Commission as well in determining whether purchases reflect prudently
incurred expenses for purposes of determining the purchaser's rates of sales to
others.



Pennsylvania Power & Light, 23 FERC ¶ 61,325 at 61,716 (1983). See also Southern Co. Servs.,
Inc., 39 FERC ¶ 63,026 at 65,147 (1987). FERC reviews the rates at which interstate
transmissions of wholesale power for resale are made; it does not preempt the states' jurisdiction
to review the reasonableness of all operating expenses that the utility wants to include in the retail
rate base.

 Even when FERC finds wholesale transmission rates are just and reasonable, a
purchaser who wishes to pass those costs on to consumers may still be required to show a need
for the power it has purchased. The Commission may properly evaluate the prudence of Gulf
States' purchase in view of the utility's long-term capacity requirements and its alternative sources
of power. The Commission's prudence inquiry was a proper function of its retail ratemaking
authority, and it did not directly or indirectly challenge the reasonableness of the FERC-approved
rates.



 Did the Commission's order impermissibly burden interstate commerce?



 In its final jurisdictional challenge, Gulf States claims that the Commission's order
disallowing recovery of the capacity costs impermissibly burdens interstate commerce. To
prevail, Gulf States must establish that the claimed burden on interstate commerce outweighs any
"putative local effects of the prudence review conducted as part of the Commission's rate-making
process." See Arkansas Elec. Coop. Corp., 461 U.S. at 393-94; Pike v. Bruce Church, Inc., 397
U.S. 137 (1970).

 "Need for new power facilities, their economic feasibility, and rates and services,
are areas that have been characteristically governed by the States." Pacific Gas & Elec. Co. v.
State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 205 (1983). Gulf States
has not demonstrated how the Commission's exercise of its traditional regulatory authority violates
the Commerce Clause.



Where [a] statute regulates evenhandedly to effectuate a legitimate local public
interest, and its effects on interstate commerce are only incidental, it will be upheld
unless the burden imposed on such commerce is clearly excessive in relation to
local putative benefits. If a legitimate local purpose is found, then the question
becomes one of degree. And the extent of the burden that will be tolerated will of
course depend on the nature of the local interest involved, and on whether it could
be promoted as well with a lesser impact on interstate activities.

 


Arkansas Elec. Coop. Corp., 461 U.S. at 393-94 (citing Pike v. Bruce Church, Inc., 397 U.S.
at 142). The regulation of retail rates is a legitimate public interest. In performing this traditional
state function, the Commission followed its statutory mandate to inquire if Gulf States had
prudently analyzed its needs for energy capacity and the other sources available to meet those
needs. By disallowing imprudently incurred capacity costs, the Commission has imposed a burden
on Gulf States' shareholders rather than impose that burden on the utility's ratepayers. But the
Commission has not imposed an excessive burden on interstate commerce that violates the
Commerce Clause.

 We hold that the Commission's actions violated neither the Supremacy Clause nor
the Commerce Clause. In so holding, we specifically conclude that (1) FERC did not review Gulf
States' prudence in contracting for the Southern capacity; (2) the Commission retained jurisdiction
to review the prudence of Gulf States' capacity purchases; (3) the Commission's disallowance of
the Southern capacity costs did not constitute impermissible trapping; (4) the Commission's
finding that Gulf States did not need the capacity it purchased from Southern did not constitute
an impermissible review of FERC-set rates; and (5) the Commission's disallowance of the
capacity costs did not excessively burden interstate commerce. We overrule Gulf States' first
three points of error.



PRECLUSION ISSUES


 In its fourth point of error, Gulf States claims that the Commission arbitrarily
ignored its earlier order in Docket No. 4501 that Gulf States needed the Southern power to ensure
adequate reserve requirements. In that earlier order, the Commission approved Gulf States'
application to amend its certificate of convenience and necessity ("CCN") to allow the utility to
build a transmission line linking Gulf States' facilities with Southern's. The Commission found
that such a transmission line "is needed in order to enable GSU [Gulf States] to import from
Southern power which is necessary to ensure adequate reserve margins and to help reduce
dependence on oil and gas based energy." Finding of Fact No. 2. Gulf States argues that this
order precludes any subsequent finding that the Southern capacity was not needed. We disagree.

 Courts do apply collateral estoppel principles to administrative proceedings, see
generally Kenneth C. Davis, Administrative Law Treatise, § 21:2-11 (2d ed. 1983 & Supp. 1989), 
and Texas courts have made limited use of preclusion principles in cases involving orders of
administrative agencies. See, e.g., Coalition of Cities for Affordable Util. Rates v. Public Util.
Comm'n, 798 S.W.2d 560 (Tex. 1990), cert. denied, 111 S.Ct. 1641 (1991); Al-Jazrawi v. Texas
Bd. of Land Surveying, 719 S.W.2d 670 (Tex. App.--Austin 1986, writ ref'd n.r.e.). As Professor
Davis explains, "[Res judicata] is at its best as it applies to an adjudication of past facts, where
the second proceeding involves the same claim or transaction as the first." Kenneth C. Davis,
Administrative Law Text (1972).

 Coalition of Cities presented such an instance. There the Commission sought to
conduct a second prudence review of a utility's expenditures, even though this matter had already
been litigated before the agency and the utility had failed to meet its burden. Coalition of Cities,
798 S.W.2d at 563. The Court determined that the second review would only embrace the same
historical investment facts scrutinized in the first prudence review. Id. Because the second
review would address subject matter identical to the first, the Court found the application of res
judicata appropriate.

 By contrast with Coalition of Cities, application of preclusion principles in this case
is unwarranted. The Commission's order in Docket No. 4501 granted Gulf States a CCN
authorizing the construction of a power line to transport Southern power from Mississippi to
Louisiana. Under PURA section 54(b), the Commission may grant a CCN only on finding that
the certificate is "necessary for the service, accommodation, convenience, or safety of the public." 
Section 54(c) further requires the Commission to consider the adequacy of existing service, the
need for additional service, the effect of the granting of a certificate on the recipient and on any
public utility of the same kind already serving the proximate area, and on such factors as
community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of cost to
consumers in such area.

 While PURA requires the Commission to consider a broad range of factors before
issuing a CCN, we do not understand the statute to require the Commission to find that the utility
has prudently selected the method by which to meet its service needs. (12) Nor did the Commission
make any such finding in Docket No. 4501. Consequently, we conclude that Docket No. 4501
did not address the subject matter of the cause currently under review, namely Gulf States'
prudence in purchasing the Southern capacity. We overrule Gulf States' fourth point of error.



EVIDENTIARY ISSUES


 In its fifth point of error, Gulf States asserts that the Commission failed to consider
certain evidence in arriving at its findings and conclusions. The utility characterizes this action
as a "discovery sanction" and complains that it was unlawful. In addition, Gulf States complains
that the Commission's declaration that its findings on the prudence issue were res judicata will
compound the harm caused by the alleged discovery sanction.



The Alleged "Discovery Sanction".

 Gulf States asserts that the Commission ignored key evidence when making critical
findings of fact. The utility argues that the Commission acted arbitrarily and capriciously in not
considering (1) Gulf States' Form 10-K; (2) a Board of Directors' Study; and (3) a report entitled
"Exxon Task-Force Studies."

 Gulf States characterizes the Commission's action as an unlawful sanction but has
not identified in the record where the hearing examiner levied any actual "discovery sanction." 
Nor has Gulf States illustrated how the hearing examiner erred when treating these particular
items. (13) Rather, Gulf States complains that the Commission failed to base its findings on this
evidence. 

 Gulf States proffered the "sanctioned" evidence to support its claim that it had
prudently considered alternative fuel sources when deciding to purchase the Southern capacity. (14) 
But at least two witnesses suggested that Gulf States deferred the Nelson-5 project after it
purchased Southern capacity. (15) The resolution of conflicting evidence goes to the credibility of
the witnesses and to the weight of the evidence. Similarly, the hearing examiner's determination that the Exxon Task-Force Studies did not support Gulf States' earlier deferral also
goes to the weight of the evidence.

 An agency may or may not accept the testimony of witnesses and the agency is the
judge of the weight accorded that testimony. Southern Union Gas Co. v. Railroad Comm'n, 692
S.W.2d 137, 141 (Tex. App.--Austin 1985, writ ref'd n.r.e.). A reviewing court is prohibited
from substituting its judgment as to the weight of the evidence on questions committed to agency
discretion. Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446,
452 (Tex. 1984). Presumably, the hearing examiner and the Commission attached greater weight
to the testimony suggesting that Gulf States' decision to defer the Nelson-5 project was made after
contracting with Southern.

 Gulf States suggests that the Commission acted arbitrarily and capriciously in
reaching this conclusion. To determine if an agency acted arbitrarily and capriciously, even
though substantial evidence supports its order or action, we look to see if the order was based on
a consideration of all relevant factors. See Starr County v. Starr Indus. Servs., Inc., 584 S.W.2d
352, 355 (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.) (citing Lewis v. Metropolitan Sav. and
Loan Ass'n, 550 S.W.2d 11, 16 (Tex. 1977)). A rational connection must exist between the facts
and the decision of the agency. Id. at 356. Here, such a connection exists: Gulf States' failure
to consider alternative sources of power before incurring long-term capacity charges led to the
Commission's finding that the capacity costs were imprudently incurred, and thus to the order
disallowing recovery of the capacity expenses. The Commission's failure to base its findings
solely upon evidence favorable to Gulf States was not arbitrary or capricious and does not
constitute a discovery sanction.



Res Judicata Application to the Commission's Factfindings.

 In this same point of error, Gulf States next argues that by attaching a res judicata
effect to its findings, (16) the Commission "greatly compounded the punitive aspect of the discovery
sanction" by preventing Gulf States from relitigating the prudence issues.

 Gulf States' complaint is premature at best. The Commission levied no discovery
sanction and no one has yet attempted to relitigate the issue of the utility's prudence. The doctrine
of res judicata relies on a previous determination of issues or claims to preclude their subsequent
relitigation. Res judicata, if pleaded, would by its very nature arise in a subsequent attempt to
relitigate already-resolved issues or claims. See, e.g., Coalition of Cities, 798 S.W.2d at 562,
565.

 The Commission's declaration that its findings are res judicata may be premature;
from Gulf States' viewpoint, the declaration may be inaccurate. But this issue does not concern
this appeal, which involves no attempt to relitigate issues previously decided by the Commission. (17)

 Finding no merit in either of these contentions, we overrule the fifth point of error.


 

GULF STATES' PRUDENCE


 In its sixth point of error, Gulf States asserts that the Commission applied a legally
incorrect standard of prudence in evaluating the purchases of Southern capacity. Gulf States
agrees with the Commission's definition of prudence, but complains that the Commission's
application of that standard allowed the company insufficient latitude in its decision-making.

 The burden of proof to show that a proposed change in rates is just and reasonable
is on the public utility. PURA § 40. "A utility has the burden to prove the prudence and
reasonableness of its expenditures before a rate increase can be approved." Coalition of Cities,
798 S.W.2d at 563. In order to include capacity charges in its rates, Gulf States had to
demonstrate the prudence of its decision to purchase the Southern capacity.

 In determining whether Gulf States met its burden, the Commission employed the
following definition of prudence:



The exercise of that judgment and the choosing of that select range of options
which a reasonable utility manager would exercise or choose in the same or similar
circumstances given the information or alternatives at the point in time such
judgment is exercised or option is chosen.



Conclusion of Law No. 25. Gulf States does not challenge this definition. Instead, it contends
that the Commission misapplied the definition.

 The examiner's report indicates that prudent decision-making may be demonstrated
in one of two ways: "[T]o recover costs in rates, a utility may show either that its decisionmaking
process was prudent, or that the same decision is in the select range of options that would have
resulted had prudent decisionmaking been employed." See Examiner's Report at 59; cf. Houston
Lighting & Power Co., Docket No. 5779, 12 Tex. Pub. Util. Comm'n Bull. 261, 313 (1985); El
Paso Elec. Co., Docket No. 6350, 13 Tex. Pub. Util. Comm'n Bull. 1091, 1119-1122 (1986).

 Under the first method, a utility presents contemporaneous documentation of its
decision-making process, thereby enabling the Commission to review the actual investigations and
analyses leading to the utility's decision. When there is no evidence of contemporaneous
investigation and analysis, a utility may employ the second method, analyzing the prudence of the
decision after-the-fact. Id. at 58-59, 173.

 We note that an attempt to demonstrate prudent decision-making by retrospective
analyses is inherently defensive and hence more suspect:



First, after-the-fact analyses are not created for the purpose of helping corporate
management reach the best decision, which would have tended to encourage
frankness about problems with different courses of conduct. Rather, they are
produced for the purpose of defending conduct already engaged in, which might
have the opposite effect. Second, such analyses might describe events, available
information, alternatives and decisions less accurately and completely than
contemporaneous documents, due to such problems as imperfect recollection,
changes in personnel or corporate philosophies and the influence of hindsight. For
these reasons, utilities are well advised to keep appropriate documentation.



Examiner's Report at 58.

 The utility without contemporaneous evidence to support its decision-making
process faces a heavy burden; the Commission will subject its after-the-fact justifications to
rigorous review. The lack of documentation impedes the Commission's ability to determine
whether the utility conducted a reasoned investigation of all relevant factors and alternatives
before reaching its decision. Thus, through independent retrospective analyses, the utility must
demonstrate that a reasonable utility manager, having investigated all relevant factors and
alternatives as they existed at the time the decision was made, would have found the utility's
actual decision a reasonably prudent course.

 Gulf States resorted to independent retrospective analyses to demonstrate the
prudence of its Southern capacity purchases. In its appellate brief, Gulf States fixates on the
language that a prudent decision must fall within "the select range of options that would have
resulted had prudent decisionmaking been employed." Gulf States claims that the Southern
purchase effectively saved its ratepayers approximately $500 million (18) and that such a benefit
placed the Southern purchase in the select range of options unless distinctly superior alternatives
were available.

 We understand Gulf States to mean that once it offered evidence that its decision
would benefit its ratepayers, it had satisfied its burden of proof, which then shifted to either the
Commission or the intervenors to show the availability of a "distinctly superior alternative" to the
decision taken. We find no basis in either PURA § 40 or the caselaw construing it for such
burden-shifting.

 Furthermore, even firm evidence that benefits flow from a particular decision
would not prove that a reasonable utility manager who had investigated all the relevant factors
available at the time Gulf States decided to purchase Southern capacity would have found that
decision reasonably prudent. An examination of such relevant factors might have indicated that
the purchase of excess capacity, despite possible attendant benefits, would be imprudent when
compared with alternative courses.

 Indeed, the Commission's findings of fact show this to be the case. Based on its
study of the record evidence, the Commission found that Gulf States




(1) knew or should have known at the time it committed to the capacity
purchases that such capacity was unnecessary to meet its needs. Finding of
Fact No. 52;


(2) failed to consider or properly analyze alternatives to the purchases of
Southern capacity and such failure constitutes imprudent action. Finding of
Fact No. 53;


(3) failed to consider or properly analyze evidence indicating that load
management techniques or cogeneration, in combination with other
alternatives, might have substituted for the Southern contracts at less cost or
risk. Finding of Fact No. 54;


(4) should have considered, but failed to consider, sensitivity or risk analyses
reflecting the effect of variations in fuel prices from those forecasted on the
advisability of purchasing Southern power. Finding of Fact No. 60;


(5) failed to analyze its most recent load forecast and to consider up-to-date
information concerning the possibility that its load would be significantly
lower than forecasted. Finding of Fact No. 50;


(6) failed to appropriately evaluate the alternative of not deferring Nelson 5. 
Finding of Fact No. 65;


(7) failed to show that the Southern purchases were needed for capacity reasons
as a result of the deferral of River Bend plant. Finding of Fact No. 61;


(8) could not rely on the two-year deferral of the River Bend plant to justify
entering into the long-term Southern contracts. Finding of Fact No. 62; and


(9) failed to make reasonable efforts to identify and negotiate with suppliers of
purchased power other that Southern. Finding of Fact No. 66.



These findings of fact indicate that at the time it made its decision to purchase the Southern
capacity, Gulf States failed to analyze data suggesting that its capacity needs might be diminishing
and could be met by instituting internal efficiencies and combining smaller, short-term purchases.

 We believe the Commission could reasonably conclude from the indicated findings
that Gulf States failed to discharge its heavy burden of showing through independent retrospective
analysis that a reasonable utility manager who had investigated the data available at the time of
the decision would have found the purchases of Southern capacity a reasonably prudent course. 
We overrule appellant's sixth point of error.



RECOVERY OF ATTENDANT COSTS


 In its seventh point of error, Gulf States makes two distinct arguments: (1) that the
Commission erroneously required the utility to demonstrate the prudence of its purchases; and (2)
that the Commission's disallowance of Gulf States' capacity charges contradicts its finding that
the energy purchases were prudent. 

 We have already established that Gulf States had the burden to demonstrate the
prudence of its energy purchases. PURA §§ 40, 41(c)(3)(D); see supra note 9. Gulf States'
argument in support of this point contains scant discussion of the Commission's alleged error and
provides nothing for review. (19) 

 Gulf States' second argument is an attempt to "piggy-back" the recovery of the
capacity charges on the recovery of the energy charges. The utility insists that it would have been
impossible to procure Southern energy without paying the capacity charges. Therefore, if the
energy charges were prudently incurred, then the capacity charges must have been prudently
incurred as well.

 The question is not whether Gulf States could obtain energy from Southern without
paying the capacity charges; the question is whether Gulf States needed the Southern capacity it
contracted to purchase. The Commission's order recites that "[t]he decision to make the capacity
payments in question was imprudent." Finding of Fact No. 71. Underlying this finding was Gulf
States' miscalculation of its need for future capacity and its inadequate examination of alternative
sources of long-term power. A review of the alternatives might have shown that Gulf States could
have secured the energy it needed from other sources without incurring the high Southern capacity
costs. Consequently, the Commission disallowed recovery of those charges from consumers.

 We detect no error in the Commission's finding that Gulf States' energy costs were
reasonable while failing to find that its capacity costs were reasonable. As Gulf States argued
before the Commission, the utility would have incurred energy charges even if it had purchased
its power from alternative sources. To the extent that the energy costs were reasonable, they were
correctly recoverable in the rate increase; to the extent that the capacity charges were imprudently
incurred, they were properly disallowed. We overrule appellant's seventh point of error. Because
Gulf States' eighth point of error complains of the cumulative effect of any previous error, and
because we have found no such error, we overrule the eighth point of error as well.



CONCLUSION


 Finding no error in the Commission's order, we affirm the judgment of the district
court.



 

 Bea Ann Smith, Justice

[Before Justices Powers, Jones and B. A. Smith]

Affirmed

Filed: October 21, 1992

[Publish]

1.   "The Southern Company is a holding company registered under the provisions of
the Public Utility Holding Company Act of 1935. Four wholly owned subsidiaries --
Alabama Power Company, Georgia Power Company, Gulf Power Company, and
Mississippi Power Company -- operate electric utility facilities on an integrated basis. 
Southern Company Services Inc. provides engineering, accounting, and other services on
behalf of the operating utilities. The four operating utilities and Southern Company
Services Inc. are signatories to the contracts with GSU [Gulf States]." Southern Company
Services, Inc., 43 FERC ¶ 61,003, at 61,010 (1988) (citations omitted).
2.   See Tex. Public Util. Comm'n, Gulf States Utils. Co., Docket No. 4501, 8 Tex. P.U.C.
Bull. 509 (August 24, 1982) (CCN amendment granted for transmission agreement)
(Memorandum Decision) ("Docket No. 4501"). 
3.   Numerous parties have contested Gulf States' requested rate increase. North Star
Steel Texas, Inc., Office of Public Utility Counsel, the cities of China, Groves, Nederland,
Port Arthur, Port Neches, and Vidor have all intervened in these proceedings. 
4.   The Federal Energy Regulatory Commission ("FERC"), the successor to the Federal
Power Commission, is the federal agency charged with regulating transmission and sale at
wholesale of electric energy in interstate commerce. 
5.   This Constitution, and the Laws of the United States which shall be made in
pursuance thereof . . . shall be the Supreme Law of the Land . . . ." U.S. Const. art. VI,
cl. 2.
6.   "The Congress shall have Power . . . To regulate Commerce . . . among the several
States." U.S. Const. art. I, § 8, cl. 3.
7.   In Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461
U.S. 375, 393 (1983), the Court abandoned the bright-line test for deciding the jurisdictional
boundaries separating state and federal regulation of electric utilities under the Commerce
Clause. Instead, the Court adopted the more current Commerce Clause analysis, balancing
state interests against federal interests to determine whether interstate commerce has been
unduly burdened. Id. at 391. However, bright-line analysis continues to determine challenges
to state regulation brought under the Supremacy Clause. See Vince & Moot, supra, at 11-12
(citing Illinois Natural Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 504 (1942). See
also Arkansas Elec. Coop., 461 U.S. at 379 (Congressional enactment of the Federal Power
Act "shifted this Court's main focus--in determining the permissible scope of state regulation of
public utilities--from the constitutional issues that concerned us in Attleboro to analyses of
legislative intent.").
8.   The utility maintains that FERC's statements concerning its jurisdiction are not
dispositive and cites to General Motors Corp. v. Illinois Commerce Commission, 574 N.E.2d
650, 656 (Ill. 1991), cert. denied, 112 S.Ct. 1936 (1992), in support. We agree with Gulf
States that FERC's pronouncements of its jurisdictional limits are not controlling; those limits
are found in the Federal Power Act and in the caselaw interpreting that Act. 


 But this is not to say that FERC's jurisdictional views are of no effect. FERC's
interpretation of its jurisdiction is persuasive and worthy of deference. See Mississippi Power
& Light, 487 U.S. at 380-82 (Scalia, J. concurring). Thus we cite to FERC orders and
opinions where we find them illustrative of a given legal principle.
9.   "Purchased power costs constitute an operating expense, which may be allowed in
rates only to the extent 'reasonable and necessary to provide service to the public.' 
PURA section 39(a), P.U.C. SUBST. R.23.21(b). Any expenditure found by the
Commission to be 'unreasonable, unnecessary, or not in the public interest' is to be
disallowed. PURA section 41(c)(3)(D), P.U.C. SUBST. R. 23.21(b)(2)(J)." Examiner's
Report at p. 44. 

 

 All parties advocated a review under a "reasonable and necessary" standard analogous
to the standard governing construction-work-in-progress (CWIP), presumably because CWIP
and long-term purchase costs each involve costly, long-term expenditures. PURA § 41(a)
provides that CWIP shall not be included in the rate base if the projects have been
"inefficiently or imprudently planned or managed." 
10.   See 26 FERC ¶ 61,360, at 61,795.
11.   Nantahala involved a state commission's attempt to adjust a FERC-ordered allocation of
low-cost entitlement power. Nantahala Power & Light was a participant in the Tennessee
Valley Authority ("TVA") power grid. The utility would supply TVA with power in return for
TVA's supply of low cost "entitlement" power. In addition, however, Nantahala also
purchased more expensive power from TVA; the utility sold the purchased power to its retail
customers.


 Because Nantahala and TVA's operating agreement involved interstate transmissions
and sales of wholesale electric power, FERC exercised jurisdiction over the wholesale rates. 
FERC allocated to Nantahala a 22.5% share of low cost; the North Carolina Utilities
Commission later recalculated this percentage upwards to 24.5% and used this higher
percentage when setting Nantahala's retail rates (by characterizing a larger percentage of
Nantahala's power as low-cost power, the commission effectively reduced the costs which
Nantahala would recover through its retail rates). 


 Nantahala argued that recalculating this percentage ran afoul of the filed rate doctrine. 
Because the state commission did not give effect to the FERC allocation, Nantahala was unable
to recover the actual costs incurred in providing power to its retail customers.


 The Supreme Court agreed with the utility and held that FERC's exclusive jurisdiction
under the FPA extended not only to the establishment of rates, but to allocations which
affected those rates. Nantahala, 476 U.S. at 972-73. The Court reasoned that the state
commission impermissibly trapped costs at the utility, costs which otherwise would be
recouped through its retail rates. See id. at 971. 
12.   The Commission itself has explained:


[T]he granting of a CCN does not bind the Commission in any manner with
regards to subsequent ratemaking treatment to be afforded the certificated
facilities.

. . .


A CCN . . . is essentially a license which indicates that a need for additional
capacity has been demonstrated and at the time of certification the
proposed/certificated facilities appeared to be a reasonable means of meeting
the additional capacity needs. However, the CCN is not a guarantee that the
facilities will be included in rate base.


El Paso Electric Co., Docket No. 5700, 10 Tex. Pub. Util. Comm'n Bull. 1071, 1099-1101
(1984) (emphasis added).
13.   The hearing examiner allowed the Form 10-K to be admitted into evidence, but did
not allow Gulf States to introduce the Board of Directors Study because it concerned Gulf
States' River Bend project and not the Nelson-5 expansion plant. Implicitly, then, the
hearing examiner made a ruling on the basis of relevancy. 


 We note that "[i]n contested cases, irrelevant . . . evidence shall be excluded." 
Administrative Procedure and Texas Register Act, Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 14(a) (West Supp. 1992) (APTRA). "Administrative proceedings are subject to
certain rules of procedure, and to the rules of civil evidence." Smith Motor Sales, Inc. v.
Texas Motor Vehicle Comm'n, 809 S.W.2d 268, 272 (Tex. App. --Austin 1992, writ denied)
(citing APTRA §§ 14, 20). Gulf States has not challenged the hearing examiner's
determination that the Study was irrelevant, arguing instead that the Commission's failure to
consider the Study was arbitrary and capricious.
14.   The Form 10-K and the Board presentation were allegedly relevant to Gulf States'
decision to defer the construction of its Nelson-5 generating plant. In order to
demonstrate the underlying prudence of the Southern purchases, Gulf States wished to
show the imprudence associated with completing the Nelson-5 unit, an alternative source
of long-term power. Opponents to the rate increase had argued that completion of
Nelson-5 was preferable to the Southern purchases.

 

 Similarly, Gulf States introduced the Exxon Task-Force Study as support for its
claim that it had adequately analyzed gas generation under alternative price scenarios. 
Because Gulf States' long-term gas contracts with Exxon were set to expire soon, the
utility was faced with the option of securing an alternative long-term gas supplier. Gulf
States maintained that the Exxon Task-Force Study demonstrated a consideration of
alternative sources of fuel and the subsequent impact that these sources would have on
Gulf States' operating costs. 
15.   The timing of the decision was critical to the prudence inquiry: a decision to defer
construction made before the contract negotiations with Southern would tend to support
Gulf States' claim that it had examined the Nelson-5 alternative. On the other hand, if
the deferral decision was made after the Southern contracts were signed, it might support
the opponents' claim that the decision to contract with Southern was made without
examining the Nelson-5 alternative. 
16.   The Commission's order stated that "[t]he Commission's findings concerning GSU's
[Gulf States'] imprudence with respect to the Southern contracts shall be res judicata with
respect to the matters addressed by such findings." Application of Gulf States Utilities Co. for
Authority to Change Rates, Tex. Pub. Util. Comm'n., Consolidated Docket Nos. 6477, 6525,
6660, 6748, 6842, Order No. 7 (October 15, 1986).
17.   Thus we take no position as to whether the Commission's findings concerning Gulf
States' imprudence are res judicata in any subsequent proceedings. 
18.   The Commission found that Gulf States' fuel-price forecasts in 1982 were
reasonable, see Finding of Fact No. 52, but this claim does not establish that the Southern
contracts saved ratepayers one-half billion dollars. The Office of Public Utility Counsel
argues that the Commission never found that the Southern purchases would save one-half
billion dollars.
19.   In a single footnote, Gulf States complains that it should not have been required to
"prove prudence and quantify imprudence" because the other parties offered no evidence
of damages and because to do so would be contrary to the Commission's statutory duty to
fix just and reasonable rates. Gulf States analogized its position to that of a defendant in
a civil trial, noting that a defendant is not burdened to prove liability or damages. 


 We find this analogy lacking. If anything, Gulf States more appropriately
resembles a plaintiff in a civil action. The utility has approached the Commission in search of
relief--in this case, a rate increase. Continuing the analogy, Gulf States, as the party seeking
relief, carries the burden of proof. In any event, PURA clearly places the burden of proof
upon Gulf States. See PURA §§ 40, 41(c)(3)(D).