# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00490-CV

**Texas Industrial Energy Consumers, Cities Advocating Reasonable Deregulation, and Office of Public Utility Counsel, Appellants**

**v.**

**Public Utility Commission of Texas and Southwestern Electric Power Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GV-14-000536, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Texas Industrial Energy Consumers, Cities Advocating Reasonable Deregulation, and the Office of Public Utility Counsel appeal from a district-court judgment rendered in a suit for judicial review of the Public Utility Commission's final order in an electric utility rate case filed by Southwestern Electric Power Company and conducted under the Public Utility Regulatory Act (PURA). *See* Tex. Util. Code tit. 2. The district court affirmed the Commission's order. We will reverse the district-court judgment and remand the case to the Commission. *See* Tex. Gov't Code § 2001.174.

**PROCEDURAL BACKGROUND**

Southwestern Electric Power Company (SWEPCO) is a fully integrated electric utility that provides service to retail and wholesale customers in Texas, Arkansas, and Louisiana.[1] In 2007, SWEPCO filed an application with the Commission for amendment of its certificate of convenience and necessity (CCN)[2] to authorize it to build a 600 megawatt "ultra-supercritical" coal-fired power plant (the Turk Plant)[3] 15 miles northeast of Texarkana in Hempstead County, Arkansas. The Commission conditionally granted the application to amend SWEPCO's CCN "upon [its] receipt of all permits and agreements required for the construction and operation of the Turk Plant." *See* Tex. Pub. Utils. Comm'n, *Application of Southwestern Electric Power Company for a*

---

[1] In 1999, the Legislature overhauled PURA to create a "fully competitive electric power industry" in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543-2625. As part of this restructuring, utilities were required, not later than January 1, 2002, to split into three distinct units: (1) a power-generation company, (2) a retail electric provider, and (3) a transmission and distribution utility. Tex. Util. Code § 39.001(a); *see City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 255 (Tex. 2018) (observing that PURA was amended in 2002 to implement competitive retail markets for electricity in Texas by requiring each electric utility to separate its business activities into three units). Only the transmission and distribution utility continued to be regulated by the Commission following deregulation. *City of Richardson*, 539 S.W.3d at 255; *see* Tex. Util. Code §§ 31.002(6) (defining "electric utility" to include transmission and distribution utilities, but expressly excluding power generation companies and retail electric providers), 32.001 (establishing Commission's jurisdiction over "electric utility"). However, the Commission delayed retail competition for customers of SWEPCO. *See* Tex. Util. Code § 39.501(b) (delaying introduction of retail competition for certain electric utilities until fair competition and reliable service are available to all retail customer classes). Consequently, SWEPCO remained a fully integrated utility subject to regulation by the Commission.

[2] The Texas Utilities Code requires an electric utility to obtain a CCN before it can extend service to Texas retail customers. Tex. Util. Code § 37.051(b).

[3] The Turk Plant was named for John W. Turk, Jr., SWEPCO's former president and chief executive officer.

*Certificate of Convenience and Necessity Authorization for Coal Fired Power Plant in Arkansas*,

Docket No. 33891 (Aug. 12, 2008) (Order). In its order in Docket No. 33891 the Commission stated:

> In balancing the risks and benefits of building versus not building base-load generation, the Commission finds that SWEPCO's plan to build the Turk Plant is the most reasonable approach to meeting the identified future power needs *given the current estimates for costs.* If the projected costs for building and operating this plant were higher, the Commission would be unlikely to find that the plant would provide the necessary benefits to consumers and would be likely to find that building the plant would place undue risks to the financial standing of the company.
>
> The Commission also recognizes the risks and uncertainties regarding the costs that will be incurred in building and operating the Turk Plant, notwithstanding the amount of costs currently locked-in by contract. Accordingly, it is appropriate to place certain limits on the costs that may be placed into base rates as part of the Commission's approval of SWEPCO's CCN amendment.
>
> **1. Capital Costs**
>
> The estimated cost of the Turk Plant, with September 2008 as the anticipated start of construction, is $1.522 billion. The Commission determines that it is unreasonable to expect Texas retail consumers to be responsible for the Texas jurisdictional allocation of any additional costs that exceed $1.522 billion. This cap on the capital costs of the Turk Plant limits the financial risk to Texas ratepayers arising out of uncertainties identified in the testimony including, but not limited to, the following: increased material and labor costs because of delays; costs as a result of changes in certification or approval of the Turk Plant by other jurisdictions; changes in the currently proposed ownership participation; and additional costs of plant construction, including those associated with the use of ultra-supercritical technology.

*Id.* at 6-7 (emphasis in original). The Turk Plant was constructed and began commercial operations in December 2012.[4]

---

[4] The Turk Plant has four co-owners, and SWEPCO's ownership share is 73.3% or 440 megawatts. Texas's jurisdictional allocation is 32.7% of SWEPCO's 73.3%.

In July 2012, SWEPCO filed an application with the Commission for authority to change its rates and reconcile its fuel costs, seeking a base rate increase of approximately $83 million in Texas. The increase primarily reflected the Turk Plant costs, which the utility sought to include in its rate base as a "prudent" investment. *See Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n*, 798 S.W.2d 560, 563 (Tex. 1990), *cert. denied*, 499 U.S. 983 (1991) ("A utility has the burden to prove the prudence and reasonableness of its expenditures before a rate increase can be approved."). The Commission referred the rate-filing package to the State Office of Administrative Hearings for hearings before an Administrative Law Judge (ALJ) on the utility's requested rate increase. At the conclusion of the hearings, the ALJs issued a proposal for decision (PFD), which contained the ALJs' findings of fact and conclusions of law. The ALJs found that SWEPCO had failed to monitor the economic viability of the Turk Plant on a continuing basis after it received the CCN. The ALJs found that in Docket No. 33891 SWEPCO had justified the Turk Plant to the Commission based on the relative price of coal to natural gas and that SWEPCO's witness testified that "the break-even price for the Turk Plant was $8.25 per Million British Thermal Units (MMBtu)." The ALJs found that when the price of natural gas fell in a steep and sustained fashion in the months and years following receipt of the CCN a reasonable utility manager would have considered cancelling the Turk Plant.[5] The ALJs cited a number of other events that occurred

[5] The ALJs found:

[Finding of Fact] 38: The price of natural gas declined in a steep and sustained fashion in the months and years following SWEPCO's receipt of the conditional CCN for the Turk Plant in August of 2008. The price of natural gas fell below the break-even price of $8.25 per MMBtu by October 2008 and continued to decline.

[Finding of Fact] 45: In June 2010, gas prices remained at approximately only one-half

4

in the June 2010 time frame that it found would have caused a reasonable utility manager to re-evaluate its decisions or consider other alternatives to completing the Turk Plant.[6]  The ALJs concluded that SWEPCO did not evaluate all relevant factors and alternative courses of action with regard to its decision to continue building the Turk Plant in light of changed economic and regulatory circumstances.  It concluded that a reasonably prudent utility manager would have realized on or before June 2010 that continued construction of the Turk Plant was too costly, and that SWEPCO should have stopped construction of the Turk Plant in June 2010 and instead installed sulfur dioxide

---

of SWEPCO's break-even price for the Turk Plant of $8.25 per MMBtu.  American Electric Power Company's 2010 fundamental forecast predicted gas prices even lower than the 2009 version.  Specifically, AEP predicted that prices would remain below $5.00 per MMBtu in real 2008 dollars until 2015, below $6.00 until 2020, and would only reach $6.82 by 2030.

The Commission adopted both of these findings.

[6]  These included the "global financial crisis" in September 2008 that "sent the United States into a recession" causing a decline in demand, the invalidation by the Arkansas Supreme Court of a Certificate of Environmental Compatibility and Public Necessity issued by the Arkansas Public Service Commission that would have permitted SWEPCO to include some of the costs of the Turk Plant in its Arkansas customers' rates, and numerous lawsuits filed by environmental-protection groups.  Specifically, the ALJs found:

[Finding of Fact] 53:  SWEPCO did not re-evaluate the need for continued construction of the Turk Plant or consider other factors or alternative courses of action in light of potentially expensive and protracted litigation.  Instead, the Company entered into costly settlements that restricted its ability to continue to operate the more economical Welsh Unit 2 because it did not want to delay construction of the Turk Plant.

[Finding of Fact] 57:  A reasonable utility manager would have re-evaluated the need for the continued construction of the Turk Plant in light of changing economic conditions.

The Commission adopted both of these findings.

5

emission controls on Welsh Unit 2. Because the ALJs concluded that SWEPCO did not meet its burden of proving that completing the Turk Plant was prudent, they found that it was "reasonable to quantify the Turk Plant capital cost allowance in rate base by adding the unavoidable investment in the Turk Plant and related transmission facilities as of June 2010, along with the cost to retrofit emission controls on another generating plant, the Welsh Unit 2." Consequently, they determined that $171 million of SWEPCO's request to recover $1.106 billion in rate base should be disallowed.

After considering the PFD, the Commission issued its order wherein it adopted most, but not all, of the ALJs' findings and conclusions. *See* Tex. Gov't Code § 2003.049(g) (outlining when Commission may change ALJ's findings and conclusions). After the Commission issued its order, motions for rehearing were filed and the Commission issued an order granting rehearing, which also set a hearing date for further consideration of the Commission's ruling on the issue of whether the "allowance for funds used during construction" (AFUDC)[7] should be included as a component of the "capital costs" of the Turk Plant that Docket No. 33981 had capped at $1.52 billion. At the hearing, which was conducted during the Commission's January 23, 2014 open meeting, the Commission reopened the record to admit additional exhibits offered by SWEPCO related to the AFUDC issue. After considering this evidence, the Commission determined that AFUDC was "a separately calculated component of capital costs that was not intended to be included in the cap" and that SWEPCO's "share of the roughly $250 million in AFUDC should be included

---

[7] AFUDC is a fixed percentage determined by the Federal Energy Regulatory Commission that compensates a utility for carrying the costs of construction. *Entergy Gulf States, Inc. v. Public Util. Comm'n*, 112 S.W.3d 208, 219 n.9 (Tex. App.—Austin 2003, pet. denied). Once the utility plant is operational, AFUDC is shifted to the utility's rate base, and the utility begins to earn a return on its investment. *Id.*

in rate base because the AFUDC was not intended to be included in the cost cap." *See* Tex. Pub. Utils. Comm'n, *Application of Southwestern Electric Power Company for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 40443 at 27 (Mar. 6, 2014) (Order on Rehearing). The Commission also "depart[ed] from the ALJs' recommendation" on the Turk Plant decisional prudence issue. It found instead that SWEPCO met its burden of proving that completing the Turk Plant was prudent, and that Texas's jurisdictional allocation, up to the cost cap included in Docket No. 33891, should be included in the utility's rate base. *Id*. at 7.

After the Commission issued its Order on Rehearing, three parties to the rate-making proceeding filed suit for judicial review in district court, seeking reversal of various aspects of the Commission's Order on Rehearing. *See* Tex. Util. Code § 15.001 (party to proceeding before Commission is entitled to judicial review under substantial evidence rule); Tex. Gov't Code § 2001.174 (substantial evidence rule). The district court affirmed the Commission's Order on Rehearing in all respects. This appeal followed.

In their appeals, Texas Industrial Energy Consumers (TIEC) and Cities Advocating Reasonable Deregulation (CARD) join in asserting that the district court erred in affirming the Commission's determination that AFUDC related to the Turk Plant was not a component of the "capital costs" capped in Docket No. 33891. TIEC and the Office of Public Utility Counsel (OPUC) join in challenging the Commission's determination that SWEPCO met its burden of proving that it was prudent to complete the Turk Plant such that the costs of the plant, subject to Docket No. 33981's cap, could be included in the utility's rate base.

7

## STANDARD OF REVIEW

To prevail in an administrative appeal, a party must show reversible error in the agency's order. *See Anderson v. Railroad Comm'n*, 963 S.W.2d 217, 219 (Tex. App.—Austin 1998, pet. denied); *see also* Tex. Gov't Code § 2001.174. The Administrative Procedure Act requires the reviewing court to reverse or remand a case if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (a) in violation of a constitutional or statutory prohibition, (b) in excess of the agency's statutory authority, (c) made through unlawful procedure, (d) affected by other error of law, (e) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole, or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174.

When reviewing an agency's fact findings and corresponding legal conclusions, a court uses the deferential substantial evidence standard. Substantial evidence review is limited in that it requires "only more than a mere scintilla" to support an agency's determination. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792-93 (Tex. 1995). Substantial evidence review "does not allow a court to substitute its judgment for that of the agency." *Id.* at 792. As such, "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* The findings, inferences, conclusions, and decisions of an agency are presumed to be supported by substantial evidence.

An agency's decision is arbitrary and capricious or results from an abuse of discretion if the agency: (1) failed to consider a factor that the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994). Other reasons an agency's decision might be considered arbitrary are if it was based on non-statutory criteria or legally irrelevant factors or if the agency reached an unreasonable result. *Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245 (Tex. App.—Austin 2008, no pet.); *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 199 (Tex. App.—Austin 2004, pet. denied).[8]

## DISCUSSION

Because it is dispositive of this appeal, we first consider whether, as contended by both TIEC and OPUC, the Commission erred in finding that SWEPCO met its burden of proving that it was prudent to continue to complete construction of the Turk Plant after June 2010 such that those construction costs could be included in SWEPCO's rate base. The Texas Utilities Code requires that "[i]n a proceeding involving a proposed rate change, the electric utility has the burden of proving that: . . . the rate change is just and reasonable, if the utility proposes the change." Tex. Util. Code § 36.006; *Coalition of Cities for Affordable Util. Rates*, 798 S.W.2d at 563. "To raise the price of its product, the utility must participate in a rate case and bear the burden of proving that each

---

[8] Because we do not reach the appellate issues challenging the Commission's interpretation of the scope of the cost cap imposed by the final order in Docket No. 33981, we will not set forth the standard for reviewing an agency's interpretation of its own order.

9

dollar of cost incurred was reasonably and prudently invested." *Entergy Gulf States, Inc. v. Public*

*Util. Comm'n*, 112 S.W.3d 208, 214 (Tex. App.—Austin 2003, pet. denied).

In its order, the Commission set forth the prudence standard as follows:

> The standard for determining prudence is the exercise of that judgment or the choosing of one of a select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

*See* Order on Rehearing at 55 (Conclusion of Law 24). The Commission stated that SWEPCO had

a duty to continue to evaluate the prudence of constructing the Turk Plant during the construction

process. *See id.* at 5.[9] The Commission expressly found that "a reasonable utility manager would

have re-evaluated the need for the continued construction of the Turk [P]lant in light of changing

economic conditions." *Id.* at 21 (Finding of Fact 57). During the ratemaking proceeding, SWEPCO

offered two studies as evidence demonstrating that it had complied with its duty to monitor the

economic viability of continued construction of the Turk Plant during the construction phase. The

first study was a 2009 report prepared for SWEPCO by ICF International comparing the Turk Plant

to a natural gas option. However, the ALJs found that SWEPCO's commissioning this report did

not demonstrate compliance with its duty to re-evaluate the prudence of continued construction

because (1) the report did not compare the Turk Plant to other alternatives such as retrofitting another

---

[9] The Order on Rehearing states: "The Commission's approval of a CCN amendment for a generation plant does not authorize the utility to continue with construction regardless of changing conditions. Rather, a company has a duty to its ratepayers to continue to evaluate the project during construction."

10

SWEPCO-owned generation plant or purchasing power in the Southwest Power Pool,[10] and (2) ICF's analysis was conducted not because SWEPCO "thought it might be a good idea to determine whether the Turk plant was economic, but only because the Louisiana Public Service Commission asked SWEPCO to perform the analysis."

The second study proffered by SWEPCO was an analysis of the economic viability of the Turk Plant it prepared in June 2010 in anticipation of a board meeting of its parent company. This analysis quantified the net present value of the Turk Plant in June 2010 compared to estimated costs to complete construction under various scenarios. The analysis showed that the Turk Plant had a negative value under some scenarios. The June 2010 study was not presented to the board of directors.

The ALJs found that "these two studies were insufficient to be viewed as contemporaneous evidence that SWEPCO took care to identify, gather information about, and evaluate the risks and option available to it when faced with extraordinary changes in circumstances." The ALJs also found that SWEPCO had no process for continued evaluation of the economics of the Turk Plant. The Commission agreed that SWEPCO had no processes to monitor the changing economics of the project and, consequently, was unable to present "contemporaneous evidence to support its decision-making process" regarding continued construction of the Turk Plant. The Commission adopted the ALJs findings that SWEPCO did not:

---

[10] The Southwest Power Pool oversees the bulk electric grid and wholesale power market in the central United States on behalf of a diverse group of utilities and transmission companies in 14 states. *See* Southwest Power Pool, https://www.spp.org/about-us/ (last visited May 16, 2018).

• implement any process for monitoring the economic viability of the Turk Plant on a continuing basis after receiving CCN approval for the plant;

• prudently monitor the economic viability of the Turk Plant following its receipt of a Texas CCN in 2008 through June 2010;

• analyze the changed capacity margin forecasts in 2010 with regard to considering other alternatives to continuation of building the Turk Plant;

• re-evaluate the need for the continued construction of the Turk Plant when faced with numerous lawsuits;

• re-evaluate the need for continued construction of the Turk Plant or consider other factors or courses of action when long-term gas prices declined significantly;

• perform any analysis of whether it made sense to construct rather than cancel the Turk Plant in light of changing economic conditions; or

• re-evaluate its decision to continue building the Turk Plant, consider other relevant factors, or consider other courses of action in light of changing economic and regulatory circumstances.

The Commission's order details at least five ways in which SWEPCO failed to act as a reasonable utility manager would have during the course of construction of the Turk Plant. Moreover, because SWEPCO had failed to implement any process to evaluate whether continued construction of the Turk Plant made economic sense in the face of changed circumstances after it received the CCN in 2008, it did not have contemporaneous evidence that its decision to complete the Turk Plant was prudent. Nevertheless, the Commission stated in its order that SWEPCO's failure to "monitor the project's economics" while construction was ongoing was not "fatal to a determination that SWEPCO's decision to complete the plant was prudent."

Citing this Court's opinion in *Gulf States Utilities Co. v. Public Utility Commission,* the Commission observed that "a utility without contemporaneous evidence to support its decision-

12

making process faces a heavy burden" of justifying its decision through an after-the-fact analysis. *See Gulf States Util. Co. v. Public Util. Comm'n*, 841 S.W.2d 459 (Tex. App.—Austin 1992, writ denied). In *Gulf States*, the Court explained:

> The utility without contemporaneous evidence to support its decision-making process faces a heavy burden; the Commission will subject its after-the-fact justifications to rigorous review. The lack of documentation impedes the Commission's ability to determine whether the utility conducted a reasoned investigation of all relevant factors and alternatives before reaching its decision. Thus, through independent retrospective analyses, the utility must demonstrate that a reasonable utility manager, having investigated all relevant factors and alternatives as they existed at the time the decision was made, would have found the utility's actual decision a reasonably prudent course.

*Id.* at 476. The Commission stated that it would subject a utility's after-the-fact justification to "rigorous review," after which it could, even in the absence of contemporaneous evidence demonstrating the utility's prudent decision-making, find that the decision to complete the Turk Plant met the prudence standard.

In its Order on Rehearing, the Commission concluded that SWEPCO had met its "heavy burden" of presenting after-the-fact justifications demonstrating that completion of the Turk Plant was a prudent decision such that its cost could be included in rate base. The Commission identified the testimony of four SWEPCO employees as providing the required retrospective analyses supporting its prudence determination. First, the Commission pointed to testimony of Karl R. Bletzacker, who was the Director, Fundamental Analysis, for American Electric Power Service Corporation (AEPSC), a subsidiary of SWEPCO's parent company, American Electric Power (AEP), that supplies administrative and technical support services to AEP's operating companies,

13

including SWEPCO. The Commission summarized Bletzacker's testimony as confirming that "natural gas prices have historically been more volatile than coal prices, and there was no indication that the relative price stability of the two fuels would materially change from that historically experienced." Bletzacker further testified that average natural gas prices rose by 11% from 2009 to 2011.

Second, the Commission referred to the testimony of Thomas P. Brice, SWEPCO's Director of Regulatory Services. The Commission summarized Brice's testimony as documenting that SWEPCO had a "generation strategy of fuel diversity to counter the volatility of gas prices." In his testimony, Brice stated that fuel diversity was an important objective of SWEPCO's 2005 Request for Proposals (the 2005 RFP) for long-term power resources. Through the 2005 RFP, SWEPCO had sought proposals to build power plants to provide new long-term peaking, intermediate, and baseload power resources to meet the growth in its customers' demand and reliability needs. It was out of that process that SWEPCO selected the proposal to build the Turk Plant "for a nominally rated 600 MW coal-fired baseload resource in southwest Arkansas." Brice testified that before the 2005 RFP, SWEPCO's generation mix in terms of capacity was 60% solid fuel and 40% natural gas. After the selection of long-term power resources through the 2005 RFP process, SWEPCO's mix of generation capacity changed to 54% solid fuel and 46% natural gas.[11] The Commission also cited Brice's testimony that as of June 2010, SWEPCO and its co-owners had "spent $947 million and had contract commitments of $425 million on the Turk Plant" and that "the

---

[11] The solid fuel percentage of the generation capacity mix was lowered because in addition to choosing to build the Turk Plant, SWEPCO also decided to build two additional gas-fired power resources, the Mattison Plant, which represented 330 MW of gas-fired peaking capacity, and the Stall Plant, a nominally rated 500 MW gas-fired combined cycle intermediate resource.

14

remaining uncommitted investment in the Turk Plant was less than the cost of a new [natural gas-fired combined-cycle plant]."

Third, the Commission pointed to the testimony of Venita McCellon-Allen, SWEPCO's President and Chief Operating Officer. The Commission summarized McCellon-Allen's testimony as confirming that as of June 2010, engineering for the Turk Plant was 93% complete and overall plant construction was 39% complete, a fact that the Commission determined "weighed heavily against halting construction." McCellon-Allen's testimony was specifically directed toward SWEPCO's decision to complete the Turk Plant after the Arkansas Supreme Court had reversed the Arkansas Public Service Commission (APSC) decision granting approval to SWEPCO to build the Turk Plant for the benefit of Arkansas ratepayers. Instead of again seeking approval from the APSC, SWEPCO proceeded with the construction and operation of the Turk Plant pursuant to a statutory exemption permitting it to do so without APSC approval if it stated that it would not seek recovery of the costs of the Turk Plant in retail rates subject to regulation by the APSC. In her testimony, McCellon-Allen cited the progress of the Turk Plant engineering and construction as a reason SWEPCO management decided "to not pursue Arkansas retail approval again, which could have delayed the whole project." Instead, McCellon-Allen testified, SWEPCO management decided that "the best course of action was to preserve the capital we had invested thus far on behalf of customers."

Fourth, the Commission cited the testimony of Scott C. Weaver, AEPSC's Managing Director for Resource Planning and Operational Analysis. Specifically, the Commission referred to a two page exhibit to Weaver's testimony that he testified represented that there "had not been a major change in SWEPCO's monitored projected capacity position from that which was set forth

15

as part of" the proceeding before the Commission that resulted in issuance of the CCN for the Turk Plant in 2008. According to the Commission, Weaver's testimony constituted evidence indicating that during the June 2010 time frame, "SWEPCO still needed the capacity provided by the Turk Plant to meet the needs of its native load customers, including wholesale customers."

The Commission concluded that through this testimony SWEPCO met its "heavy burden" of satisfying the *Gulf States* standard of demonstrating through independent, retrospective analysis that a reasonable utility manager, having investigated all relevant factors and alternatives as they existed at the time the decision was made, would have found SWEPCO's actual decision a reasonably prudent course. On appeal, the Commission argues that it properly applied the *Gulf States* standard. TIEC and OPUC disagree, arguing that while the Commission correctly stated the *Gulf States* standard, it failed to hold SWEPCO to that standard. They assert that the Commission's conclusion that the utility had met its burden of proving prudent decision-making was unreasonable and therefore arbitrary and capricious. We agree.

In *Gulf States*, this Court stated that a utility could meet its burden of proving prudence through an analysis of the decision after the fact through "independent retrospective analyses." *Gulf States*, 841 S.W.2d at 476. None of the evidence the Commission relied on when conducting its "rigorous review" of SWEPCO's after-the-fact justification is independent. All of it was the testimony of SWEPCO's own employees. Moreover, the testimony of these witnesses, individually or collectively, does not constitute a retrospective *analysis* of whether continued construction of the Turk Plant under the contemporaneous circumstances was a reasonably prudent course of action. The historic volatility of natural gas prices discussed by Bletzacker is a fact, not an

16

analysis supporting the decision to continue to build the Turk Plant despite the fact that natural gas prices fell dramatically shortly after the CCN was granted in 2008 and remained below SWEPCO's stated break-even price of $8.25 per MMBtu for the duration of the construction process. Bletzacker's testimony does not attempt to explain why completing the Turk Plant continued to be a reasonably prudent course when AEP's own 2010 forecast predicted that gas prices would remain below $5.00 per MMBtu until 2015, below $6.00 until 2020, and would only reach $6.82 by 2030. Bletzacker's testimony provides no discussion of alternatives to completing the Turk Plant, nor does it include any analysis of whether a reasonable utility manager, having investigated the alternatives, would have found it prudent to continue to build the Turk Plant.

With regard to fuel diversity, Brice's testimony focused on SWEPCO's generation strategy of fuel diversity to counter the volatility of natural gas prices. Brice did not, however, provide any analysis of why, in light of the company's own 2010 forecast predicting that natural gas prices would remain below the Turk Plant's break-even point for the next twenty years, the decision to continue to construct the Turk Plant was justified by that generation strategy. And Brice's testimony that SWEPCO had already spent $947 million is simply another fact that alone provides no insight into whether a reasonable utility manager would continue to complete a plant that was, according to McCellon-Allen, only 39% complete. Similarly, Weaver's testimony that SWEPCO still had some capacity needs for its native load customers did not include any analysis of why continuing to construct the Turk Plant was the choice a reasonable utility manager would make among other alternatives to fulfill that need. The Commission's own findings highlight this deficiency. The Commission expressly found that retrofitting the Welsh Unit 2 or purchasing power in the

17

Southwest Power Pool were alternatives to the Turk Plant, yet Weaver's testimony does not address these alternatives. *See* Order on Rehearing at 20 (Finding of Fact 62) ("The 2009 ICF report did not compare the Turk Plant to other alternatives such as retrofitting the Welsh Unit 2 or purchasing power.").[12] McCellon-Allen's testimony was limited to the decision to complete the Turk Plant despite losing the Arkansas CECPN; it does not address other circumstances that the Commission expressly found that a reasonable utility manager would have considered such as the decline in natural gas prices and the changed capacity margin forecasts.[13]

---

[12] The Commission also found that the Welsh Unit 2 was retired more than 20 years prior to the end of its useful life, a decision it determined SWEPCO had not justified with thorough analysis. *See* Order on Rehearing at 28 (Finding of Fact 119) ("SWEPCO did not justify with thorough analysis its decision to retire Welsh Unit 2 more than 20 years prior to the end of its useful life.").

[13] The Commission made the following findings:

[Finding of Fact] 41: In September 2008, a global financial crisis sent the United States into a recession. The recession reduced economic activity, which reduced the need for new generation facilities. SWEPCO's customers reduced their usage during this time. By the time SWEPCO's March 2010 capacity, demand, and reserves report (CDR) was compiled, SWEPCO's projections of peak demand had fallen 132 to 164 MW for the 2013-2017 period compared to the projections used in the early 2008 CDR table submitted in Docket No. 33981.

[Finding of Fact] 43: SWEPCO's March 2010 CDR shows that had SWEPCO cancelled Turk, it would have required an average of only 28 more megawatts per year until 2017 to meet its required capacity margin.

[Finding of Fact] 44: From 2009 to the present, there has been ample capacity for SWEPCO to purchase power in the Southwest Power Pool (SPP) to meet capacity needs.

McCellon-Allen's testimony does not address these circumstances or compare the alternative available sources for the additional power needed to meet customer demand to completing the 600 MW Turk Plant.

The evidence that the Commission found to satisfy SWEPCO's burden does not provide any *analysis* of the relevant factors and alternatives to completing the Turk Plant as they existed in June 2010. Consequently, the evidence does not demonstrate that a reasonable utility manager who had investigated all the relevant factors available at the time would have found that the decision to continue construction of the Turk Plant after June 2010 was reasonably prudent. At most, the SWEPCO witnesses' testimony identifies some benefits, at least to SWEPCO, that could flow from the decision to complete the Turk Plant. SWEPCO's evidence neither qualifies as independent nor constitutes a retrospective analysis under the standard specifically adopted by the Commission. *See Gulf States*, 841 S.W.2d at 476 (noting that attempts to demonstrate prudent decision-making by retrospective analysis are inherently defensive and hence more suspect). Not requiring SWEPCO to meet the standard it identified in its Order on Rehearing for demonstrating prudent decision-making in the absence of contemporaneous evidence renders the Commission's decision arbitrary and capricious. *See id.* ("When there is no evidence of contemporaneous investigation and analysis, a utility may employ the second method, *analyzing* the prudence of the decision after-the-fact." (Emphasis added.)). Here, there was simply no analysis for the Commission to rigorously review.

We sustain TIEC's second and OPUC's sole appellate issues. We reverse the Commission's determination that SWEPCO met its burden of proving that a reasonable utility manager, having investigated all relevant factors and alternatives as they existed at the time the decision was made, would have found that the utility's actual decision to continue constructing the Turk Plant after June 2010 was reasonably prudent. Because it is based on that determination, we

19

also reverse the Commission's finding that SWEPCO's decision to complete the Turk Plant was within the range of options that a reasonable utility manager would choose under the same or similar circumstances.[14]

## CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment affirming the Commission's determination that SWEPCO met its burden of proving that it was prudent to continue to complete the Turk Plant after June 2010. We remand the cause to the Commission for proceedings consistent with this opinion.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Reversed and Remanded

Filed: July 10, 2018

---

[14] Because of our disposition of TIEC's second and OPUC's sole appellate issues, we need not address any challenges to the Commission's determination that the cap on costs included in the Final Order in Docket No. 33891 did not include AFUDC.