# IN THE SUPREME COURT OF TEXAS

No. 18-1061

PUBLIC UTILITY COMMISSION OF TEXAS AND
SOUTHWESTERN ELECTRIC POWER COMPANY, PETITIONERS,

v.

TEXAS INDUSTRIAL ENERGY CONSUMERS, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued December 3, 2020**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE HUDDLE did not participate in the decision.

Forecasting the future supply of electric power in Texas and consumer demand for it is challenging given the variables on both sides of the equation. Once a forecast is made, and the approved construction of a new power plant well underway, a decision whether to abandon construction based on new forecasting is even more difficult. This case concerns the standard for evaluating a utility's decision to complete an approved project and the degree courts must defer to the Public Utility Commission, which is charged with making that evaluation.[1]

---

[1] The Public Utility Commission (Commission) is a state regulatory agency established and governed by the Public Utility Regulatory Act. TEX. UTIL. CODE §§ 11.00–66.016. The Act "establish[es] a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities." *Id.* § 11.002(a).

The Commission determined that the Southwestern Electric Power Company's decision to complete construction of a power plant was "one of a select range of options" that a reasonable utility manager could have chosen. Because SWEPCO had not maintained records reflecting a continuous reassessment of its decision to build the plant, it bore the burden before the Commission of establishing that its decision was a prudent one through after-the-fact justifications. Having concluded that SWEPCO met this burden, the Commission allowed SWEPCO to include the plant's construction costs in its utility rates.

The Respondents here[2] challenged the Commission's ruling in state district court. They argued that the Commission's decision to allow part of the construction costs was arbitrary and lacked evidence to support it because SWEPCO did not provide an outside expert's assessment of the decision to continue construction. Rejecting that contention, the trial court upheld the Commission's decision in all respects.

The court of appeals reversed, concluding that the Commission had set a standard that required evidence of "independent, retrospective analyses" of the project.[3] Because SWEPCO did not produce independent expert testimony, the court held, the Commission had no basis for its decision.[4]

The Commission and SWEPCO, the Petitioners here, contend that the Commission properly applied its standard for assessing SWEPCO's decision to complete construction of the plant. They further contend that substantial evidence supports the Commission's conclusions. The

---

[2] The Respondents in this Court are Texas Industrial Energy Consumers, the Office of Public Utility Counsel, and Cities Advocating Reasonable Deregulation. The Office of Public Utility Counsel is a state agency that "represents the interests of residential and small commercial consumers." *Id.* § 13.001. It may intervene as a matter of right in a judicial proceeding that involves an administrative agency action in which it is authorized to appear. *Id.* § 13.003(a)(4). Cities Advocating Reasonable Deregulation is a municipal coalition whose members have jurisdiction over SWEPCO's rates and services within their respective city limits. *See id.* § 33.001(a).

[3] 608 S.W.3d 817, 827–29 (Tex. App.—Austin 2018).

[4] *Id.* at 827–28.

2

parties also present an issue that the court of appeals did not reach: whether the Commission erred in permitting SWEPCO to include financing costs[5] that exceeded the project's initial cap on capital costs in its rate base.[6]

We hold that the Commission properly applied its standard in evaluating SWEPCO's decision to complete construction and substantial evidence supports the Commission's decision. Though outside expert analysis is evidence that the Commission may consider, it does not replace the standard of review the Commission used in this case: whether a reasonably prudent utility manager could have decided to complete construction under the circumstances. The Commission applied the standard it set forth in concluding that completing construction was a prudent decision. Relying mainly on the absence of "independent, retrospective analyses," the court of appeals erred in rejecting the evidence that supports the Commission's findings. Accordingly, we reverse the judgment of the court of appeals. We remand the case to that court for it to consider in the first instance whether the Commission arbitrarily permitted SWEPCO to further adjust the rate base to include capital financing costs.

---

[5] The financing costs at issue are known as the "allowance for funds used during construction" or AFUDC. AFUDC refers to the "carrying costs" used to finance a long-term construction project. *See Cities for Fair Util. Rates v. Pub. Util. Comm'n of Tex.*, 924 S.W.2d 933, 935 (Tex. 1996) (explaining that AFUDC "is simply an entry in a utility's books to indicate the cost of capital used during construction").

[6] 608 S.W.3d at 829 n.14 ("[W]e need not address any challenges to the Commission's determination that the cap on costs . . . did not include AFUDC."). "The rate base, sometimes referred to as invested capital, includes as a major component the original cost of plant, property, and equipment, less accumulated depreciation, used and useful in rendering service to the public." 16 TEX. ADMIN. CODE § 25.231(c)(2). We have explained:

> [A] utility's rates must be set so as to produce revenues equal to the sum of two amounts. One is the utility's "reasonable and necessary operating expenses", including taxes and depreciation. The other is "a reasonable return on its invested capital used and useful in rendering service to the public". That capital is the utility's rate base. Thus, a utility is entitled to rates sufficient to repay its expenses, without a return or profit on those expenses, and to provide a return on the invested capital included in its rate base, without repaying that investment.

*Cities for Fair Util. Rates*, 924 S.W.2d at 935.

# I

SWEPCO is a fully integrated electric utility that provides service to retail and wholesale customers in Texas, Arkansas, and Louisiana. Within its Texas service area along the northeastern Texas border and the eastern side of the Texas Panhandle, SWEPCO must provide electric power to anyone who requests it. It must also maintain sufficient capacity to meet its ratepayers' power needs.

The Commission regulates SWEPCO's business, including construction of new power plants, and it sets the rates that SWEPCO may charge its Texas customers.[7] The Commission must ensure that SWEPCO's rates are "just and reasonable."[8] Those rates must also allow SWEPCO "a reasonable opportunity to earn a reasonable return" on its invested capital.[9]

In 2005, SWEPCO identified a need for more "long-term baseload capacity and energy resources" to serve its Texas customers. SWEPCO asked the Commission to approve the construction of three new power plants. The Commission authorized construction of two gas-fired plants, issuing certificates of convenience and necessity for their construction. The Commission later approved the third plant, the John W. Turk, Jr. Plant,[10] a coal-fired power plant located in

---

[7] TEX. UTIL. CODE § 14.001 ("The commission has the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by this title that is necessary and convenient to the exercise of that power and jurisdiction."); *see id.* § 36.001(a) ("The regulatory authority may establish and regulate rates of an electric utility . . . .").

[8] *Id.* § 36.003(a).

[9] *Id.* § 36.051.

[10] Tex. Pub. Util. Comm'n, Order at 1, *Application of Southwestern Electric Power Co. for a Certificate of Convenience & Necessity Authorization for Coal Fired Power Plant in Arkansas*, Docket No. 33891 (Aug. 12, 2008), 2008 WL 3893628 [hereinafter *CCN Order*]. "The Turk plant includes an ultra-supercritical pulverized coal steam generator operating at advanced steam conditions powering a single re-heat steam turbine generator, making it one of the cleanest, most efficient coal-fueled plants in the United States." Tex. Pub. Util. Comm'n, Order on Rehearing at 17, *Application of Southwestern Electric Power Co. for Authority to Change Rates & Reconcile Fuel Costs*, Docket No. 40443 (Mar. 6, 2014), 2014 WL 1006773 [hereinafter *Order on Rehearing*].

Hempstead County, Arkansas.[11] The Commission determined that "SWEPCO's plan to build the Turk Plant [was] the most reasonable approach to meeting the identified future power needs given the current estimates for costs."[12] However, the Commission limited the costs that SWEPCO could include in its Texas rate base "to Texas's jurisdictional allocation of SWEPCO's ownership share of [the] total plant cost of $1.522 billion."[13] In short, the Commission permitted the construction of the Turk Plant, but it capped the costs that Texas consumers would bear for its construction.

When the Commission grants a certificate of convenience and necessity, "the utility receives the right to invest capital in an asset and upon completion of the asset, the amount of the investment found to be prudent will be placed in the utility's rate base."[14] The certificate "affords only a right to begin construction."[15] It is not a guarantee that "every inefficient or imprudent expenditure will be passed on to the consuming public."[16] Thus, even when the Commission issues a certificate to build a power plant, "that asset will not be included in the utility's rate base until a rate hearing is conducted and the Commission determines that the costs of building the asset are prudent, reasonable and necessary and related to property that is used and useful in providing service."[17]

---

[11] The Turk Plant has four owners: East Texas Electric Cooperative, Arkansas Electric Cooperative Corporation, Oklahoma Municipal Power Authority, and SWEPCO, which owns approximately 73% of the plant. The Commission's approval was contingent on SWEPCO "obtaining all of the necessary environmental permits." *CCN Order* at 4.

[12] *Id.* at 6–7 (emphasis omitted).

[13] *Id.* at 4 ("[T]he Commission conditionally grants the CCN for SWEPCO's ownership in the 600 MW Turk Plant on obtaining all of the necessary environmental permits, limits the costs that may be included in ratebase to Texas's jurisdictional allocation of SWEPCO's ownership share of total plant cost of $1.522 billion, and places other limitations and requirements on SWEPCO." (footnote omitted)); *see id.* at 7.

[14] *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 198 (Tex. 1994).

[15] *Tex.–N.M. Power Co. v. Tex. Indus. Energy Consumers*, 806 S.W.2d 230, 233 (Tex. 1991).

[16] *Id.*

[17] *Id.*

SWEPCO completed construction of the Turk Plant in 2012. It then applied to the Commission for an increase in its rate base to include the plant's construction costs.[18] The Respondents intervened to contest SWEPCO's request. They argued that SWEPCO could not demonstrate that completing the Turk Plant was a prudent decision. SWEPCO had failed to monitor the economic viability of the plant during construction and, they contended, a reasonable utility manager would have abandoned construction before it was completed.

The Commission referred the case to the State Office of Administrative Hearings. After a ten-day hearing, a panel of administrative law judges agreed that SWEPCO had failed to monitor the economic feasibility of the Turk Plant during its construction, and it found that SWEPCO should have stopped construction by June 2010.[19] The panel determined that continued construction was too costly given the steadily decreasing price of natural gas and changing economic conditions that likely would suppress consumer demand.[20] The prudent choice instead, the panel found, would have been to retrofit a different coal-fired generating plant.[21] Consequently, the panel proposed that the Commission disallow $171 million of the plant's costs and exclude them from SWEPCO's rate base.[22]

---

[18] *Order on Rehearing* at 1 ("The primary contested issue regarding the proposed increase involves the portion of SWEPCO's share of the costs of the Turk coal plant . . . ."). Before the Commission, SWEPCO's President and Chief Operating Officer testified that SWEPCO sought an "$83.1 million base rate increase in its Texas non-fuel rates" and explained that "[t]he rate increase consist[ed] primarily of the inclusion of the Turk and [one of the gas-fired] power plants into SWEPCO's rates ($71.8 and $15.6 million of the increase, respectively)."

[19] Tex. State Office of Admin. Hearings, Proposal for Decision at 2, 4, 39, *Application of Southwestern Electric Power Company for Authority to Change Rates and Reconcile Fuel Costs*, SOAH Docket No. 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, PUC Docket No. 40443 (May 20, 2013).

[20] *Id.* at 40.

[21] *Id.*

[22] *Id.* at 339.

The Commission adopted most of the panel's findings and conclusions, but on rehearing, it reopened the record to consider additional evidence.[23] The Commission issued its final and appealable order, the Order on Rehearing, in 2014. In that order, the Commission disagreed with the panel and concluded that SWEPCO had made a reasonably prudent decision in completing construction of the Turk Plant.

At the outset, the Commission agreed with the panel that SWEPCO "did not meet its duty to monitor the project's economics while construction was ongoing" because it had no contemporaneous evidence of its decision-making process.[24] SWEPCO thus bore a "heavy burden" to demonstrate after the fact that its decision was a prudent one.[25]

The Commission then explained the standard for evaluating whether SWEPCO carried its burden.[26] The Commission required SWEPCO to show that a reasonable utility manager could have made the decision to complete construction, as SWEPCO did, rather than abandon it. As support for that standard, the Commission cited a court of appeals case, *Gulf States Utilities Co. v. Public Utility Commission of Texas*.[27] The Commission observed that, in that case, the court of appeals had noted that a utility without contemporaneous documentation nevertheless could prove that its decision was prudent "through independent, retrospective analyses."[28] After reviewing the evidence in light of its standard and subjecting SWEPCO's after-the-fact justifications to "rigorous review," the Commission determined that the decision to complete construction of the Turk Plant

---

[23] *See* TEX. GOV. CODE § 2003.049(g) ("[T]he commission may change a finding of fact or conclusion of law made by the administrative law judge or vacate or modify an order issued by the administrative law judge . . . .").

[24] *Order on Rehearing* at 6.

[25] *Id.*

[26] *Id.* at 5–6.

[27] 841 S.W.2d 459 (Tex. App.—Austin 1992, writ. denied).

[28] *Order on Rehearing* at 6 (citing *Gulf States*, 841 S.W.2d at 476).

was within the range of options that a reasonably prudent utility manager could select under the circumstances.[29] It allowed SWEPCO to include the Texas share of the plant's construction costs in the rate base.[30]

The Respondents sought judicial review in state district court, contesting the Commission's conclusion that SWEPCO acted prudently in continuing with construction of the Turk Plant after June 2010.[31] The trial court affirmed the Commission's order.

The court of appeals reversed.[32] It held that SWEPCO did not meet the standard for demonstrating prudence that the Commission itself had identified; thus, the Commission's decision was arbitrary and capricious.[33] The court of appeals explained that, because the Commission had quoted the *Gulf States* opinion, the Commission had set a standard that required SWEPCO to present "independent retrospective analyses" through outside expert testimony.[34] SWEPCO's evidence was not "independent," the court of appeals concluded, because "[a]ll of it was the testimony of SWEPCO's own employees."[35] That employee testimony also did "not

---

[29] *Id.* at 6–7. The Commission further decided that "AFUDC was a separately calculated component of capital costs that was not intended to be included in the cap." *Id.* at 10.

[30] *Id.* at 7.

[31] *See* TEX. UTIL. CODE § 15.001 ("Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule.").

[32] 608 S.W.3d 817, 819 (Tex. App.—Austin 2018). Specifically, Texas Industrial Energy Consumers and the Office of Public Utility Counsel challenged the Commission's determination that SWEPCO acted prudently in completing the Turk Plant. *Id.* at 822. Texas Industrial Energy Consumers and Cities Advocating Reasonable Deregulation argued that the district court erred in affirming the Commission's determination that AFUDC was not a component of the capital costs capped in the CCN Order. *Id.*

[33] *Id.* at 828 ("Not requiring SWEPCO to meet the standard it identified in its Order on Rehearing for demonstrating prudent decision-making in the absence of contemporaneous evidence renders the Commission's decision arbitrary and capricious.").

[34] *Id.* at 827 (quoting *Gulf States Utils. Co. v. Pub. Util. Comm'n of Tex.*, 841 S.W.2d 459, 476 (Tex. App.—Austin 1992, writ denied)).

[35] *Id.*

constitute a retrospective *analysis* of whether continued construction of the Turk Plant" was prudent—the testimony was factual, not analytical.[36] We granted review.

## II

We accord Commission decisions in contested rate cases particular deference under the statutory "substantial evidence" standard.[37] Under that standard of limited judicial review, we must not reverse the Commission's rate determination unless it prejudices the Respondents' substantial rights.[38] Such prejudice may occur when the Commission's findings, inferences, conclusions, or decisions are:

> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[39]

We must uphold the Commission's decision if "there is some reasonable basis in the record for the action taken by the agency."[40]

The Respondents argue that the Commission's Order on Rehearing cannot withstand this deferential review for two reasons. First, as the court of appeals held, the Commission's decision was arbitrary because it did not comport with the standard the Commission stated that it would use

---

[36] *Id.*

[37] TEX. UTIL. CODE § 15.001 ("Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule."); *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995) (explaining that substantial evidence review "is a limited standard of review that gives significant deference to the agency in its field of expertise").

[38] TEX. GOV. CODE § 2001.174 (Review Under Substantial Evidence Rule or Undefined Scope of Review).

[39] *Id.*

[40] *Torch Operating Co.*, 912 S.W.2d at 792 (emphasizing that "[t]he issue for the reviewing court is not whether the agency reached the correct conclusion").

to evaluate SWEPCO's request for recovery of its costs.[41] Second, the Commission's decision lacks reasonable support in the evidence.

The analysis for each issue is distinct. Whether the Commission's decision was arbitrary looks to the Commission's process. A Commission decision is arbitrary if it: "(1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result."[42] A review of the evidence, in contrast, considers whether any evidence supports the Commission's determination. "Substantial evidence requires only more than a mere scintilla, and 'the evidence on the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence.'"[43] We presume that substantial evidence supports the Commission's "findings, inferences, conclusions, and decisions" once the case reaches state district court; at that point, "the burden is on the contestant to prove otherwise."[44]

## A

Rate-setting is the domain of the Commission.[45] The Commission has broad discretion to set utility rates,[46] but it must "ensure that each rate an electric utility . . . make[s], demand[s], or receive[s] is just and reasonable."[47] The statute does not define "just" or "reasonable"; that

---

[41] *See* 608 S.W.3d at 828.

[42] *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994).

[43] *Torch Operating Co.*, 912 S.W.2d at 792–93 (quoting *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)).

[44] *See Charter Med.-Dall., Inc.*, 665 S.W.2d at 453.

[45] *Pub. Util. Comm'n v. AT & T Commc'ns of the Sw.*, 777 S.W.2d 363, 366 (Tex. 1989) ("As long as the commission addresses the rate considerations set by the Public Utility Regulatory Act, the particular factors and the weight to be given those factors are within the discretion of the commission.").

[46] The Legislature granted the Commission the "authority to make and enforce rules necessary to protect customers of . . . electric services consistent with the public interest." TEX. UTIL. CODE § 11.002(c). The Commission "has the general power to regulate and supervise the business of each public utility." *Id.* § 14.001.

[47] *Id.* § 36.003(a).

determination is left to the Commission. The Legislature specifies only that the Commission must "establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses."[48]

The Commission has adopted a standard for evaluating capital investment costs that a utility seeks to pass on to its ratepayers. It asks whether the capital investment was prudent.[49] The parties dispute the prudence standard the Commission used in this case. The Respondents assert that the Commission required SWEPCO to prove its case in one way: through "independent, retrospective analyses." The Commission and SWEPCO counter that nothing in the Commission's order so narrowed the acceptable evidence supporting the justifications for completing the plant.

The Commission squarely articulated the prudence standard it used to decide the case in its conclusions of law: "The standard for determining prudence is the exercise of that judgment or the choosing of one of a select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option chosen."[50] The Commission reiterated this straightforward recitation in the body of the Order,[51] where the Commission further explained that

---

[48] *Id.* § 36.051; *see id.* § 36.052 (setting out the factors the Commission "shall consider" in "establishing a reasonable return on invested capital"); *see also id.* § 36.053(a) (stating that "[e]lectric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service").

[49] The Commission has explained that Justice Brandeis's concurring opinion in *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri*, 262 U.S. 276 (1923), is "the source [of] the prudence standard applied by th[e] Commission, [which] recognized that dishonest or obviously wasteful or imprudent expenditures could be excluded from rate base because such costs were not used and useful in providing service to the public." Tex. Pub. Util. Comm'n, Examiners' Report at 11, *Application of Texas–N.M. Power Co. for Authority to Change Rates*, Docket 9491 (Feb. 7, 1991), 16 Tex. P.U.C. Bull. 2825.

[50] *Order on Rehearing* at 55.

[51] *Id.* at 5 ("The Commission also notes that a utility's conduct is prudent when it involves 'the exercise of judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such

---

11

the "prudence standard" allows for a range of options and, within those options, it defers to a utility's business judgment:

> [This standard] contemplates that (1) there may be more than one prudent option within the range available to a utility in any given context; (2) any choice within the select range of reasonable options is prudent; (3) the Commission should not substitute its judgment for that of the utility; and (4) the reasonableness of a decision must be judged in light of the circumstances, information, and available options existing at the time, without benefit of hindsight.[52]

The standard is flexible enough to consider that multiple prudent options may be available to a reasonable utility manager under the circumstances. Because the Commission found that SWEPCO lacked contemporaneous evidence to support its decision-making process, SWEPCO faced a "heavy burden" and the Commission's "rigorous review."[53]

Following its discussion of the prudence standard, the Commission addressed *Gulf States Utilities Co. v. Public Utility Commission of Texas.*[54] It wrote:

> In *Gulf States*, the court noted that a lack of documentation supporting a utility's decision impedes the Commission's ability to determine whether the utility conducted a reasoned investigation of all relevant factors and alternatives before reaching its decision. However, the court went on to determine that a utility's decision may have still been prudent if through *independent, retrospective analyses*, the utility is able to demonstrate that a reasonable utility manager, having investigated all relevant factors and alternatives as they existed at the time the decision was made, would have found the utility's actual decision a reasonably prudent course.[55]

---

judgment is exercised or option is chosen.'" (quoting *AEP Tex. N. Co. v. Publ. Util. Comm'n of Tex.*, 297 S.W.3d 435, 450 (Tex. App.—Austin 2009, pet. denied))).

[52] *Id.*

[53] *Id.* at 6.

[54] 841 S.W.2d 459 (Tex. App.—Austin 1992, writ. denied).

[55] *Order on Rehearing* at 6 (citing *Gulf States*, 841 S.W.2d at 476) (emphasis added).

Seizing on this language, the Respondents argue that the Commission obligated SWEPCO to prove that its continued construction of the plant was prudent based on "independent, retrospective analyses," which they equate with outside expert testimony.

We disagree. In summarizing *Gulf States*, the Commission did not require SWEPCO to present "independent, retrospective analyses" through an outside expert. The phrase is not a reference to any term of art. The point of an "independent" analysis in this context is not that the utility hires an outside expert. Rather, the Commission must independently conduct its review of a utility's decision-making without deference to the decision that the utility actually made. "Retrospective" is another way to say "looking at the past," which any analysis must do in the absence of a contemporaneous analysis.[56]

The Commission's reference to *Gulf States* did not change the Commission's standard for deciding the case; it is instead an example of its application. The key question in *Gulf States* was whether a utility lacking contemporaneous documentation could meet its burden simply by showing that "its decision would benefit its ratepayers."[57] The Commission rejected the utility's request for a rate increase based on capital costs. In upholding that decision, the court of appeals concluded that, without evidence that the utility's decision was a prudent one at the time, evidence of a ratepayer benefit did not overcome the Commission's determination to disallow the costs.[58]

Its discussion of *Gulf States* notwithstanding, the Commission set forth the standard it applied—a standard that does not limit the acceptable evidence to outside expert testimony. The

---

[56] *Retrospective*, MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) ("of, relating to, or given to retrospection . . . affecting things past"); *see Retrospection*, MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) ("the act or process or an instance of surveying the past").

[57] *Gulf States*, 841 S.W.2d at 476.

[58] *Id.* at 476–77 ("[E]ven firm evidence that benefits flow from a particular decision would not prove that a reasonable utility manager who had investigated all the relevant factors available at the time Gulf States decided to purchase Southern capacity would have found that decision reasonably prudent.").

Commission's inquiry instead focused on whether the historical facts adduced at the hearing demonstrated that the decision to continue construction was within the range of reasonably prudent decisions available to a utility manager under the circumstances. As the Commission stated, the ultimate question was whether the decision fell within the "select range of options which a reasonable utility manager would exercise or choose" based on the information available at the time.[59]

The Respondents do not dispute that the Commission independently must analyze whether a decision was prudent. In other words, the Commission may apply its expertise.[60] The Public Utility Regulatory Act grants the Commission broad discretion to determine whether a utility carried its burden in seeking a rate increase, and the Commission retains the exclusive authority to make the final findings of fact in a contested case.[61] Nothing in the Commission's jurisprudence, nor in its reference to *Gulf States*, prevented the Commission from assessing prudence based on the historical facts and the employee testimony adduced at the hearing. While employee testimony may be less persuasive than contemporaneous records or expert testimony, the court of appeals erred in concluding that such testimony must be excluded from any review of the Commission's decision.

Because the "prudence standard" is the Commission's to formulate, it may demand outside expert testimony where contemporaneous evidence is lacking.[62] But it did not do so in this case.

---

[59] *Order on Rehearing* at 5, 55.

[60] As the United States Supreme Court has observed, "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 314 (1989).

[61] TEX. UTIL. CODE § 14.051(5); TEX. GOV'T CODE § 2003.049(g).

[62] In other orders, the Commission has included the term "independent, retrospective analysis" in its recitation of the prudence standard set forth in the conclusions of law. But the Commission has not defined the standard to exclude employee testimony or evidence of historical facts, or to require outside experts, as the court of appeals did in this case. *See, e.g.,* Tex. Pub. Util. Comm'n, Order on Rehearing at 24, *Application of Southwestern Public Service*

The court of appeals erred by circumscribing the evidence the Commission could consider, in contravention of the Commission's order and its statutorily granted discretion to set just and reasonable rates. Because the Commission adhered to the standard it set forth, we hold that the Respondents fail to establish that the Commission's decision was arbitrary and capricious.

**B**

We next consider, under the Commission's standard, whether substantial evidence supports its conclusion that continuing construction of the Turk Plant after June 2010 was within the range of a reasonably prudent utility manager's options. We hold that it does.

The Commission summarized the evidence of after-the-fact reasons for completing construction. First, natural gas prices historically have been volatile. There was no indication that those prices would stabilize over the projected fifty-year life of the plant, and natural gas prices increased from 2009 to 2010 during construction. Fuel diversity is a reasonable strategy to counter price volatility in alternative fuel sources over the decades of operation of a power plant. SWEPCO adduced evidence that a diverse "generation fleet profile" protects SWEPCO and its customers from "the vagaries of supply, transportation and market pricing of a sole commodity."

SWEPCO presented evidence concerning the historical prices of natural gas, indicating the commodity's volatility—from $2.18MMBTU in 1998, to $9.84MMBTU in 2008, and to approximately $6.00MMBTU in 2010. The price of coal, in contrast, remained stable within the same period. Because the other two Commission-approved plants were gas-fired, SWEPCO's new

---

*Co. for Authority to Reconcile Fuel & Purchased Power Costs*, Docket No. 48973 (Feb. 18, 2020), 2020 WL 1304498 ("A utility may demonstrate the prudence of its decision-making through contemporaneous evidence. Alternatively, the utility may obtain an independent, retrospective analysis that demonstrates that a reasonable utility manager, having all relevant factors and alternatives as they existed at the time the decision was made, would have found the utility's actual decision to be a reasonably prudent course."); Tex. Pub. Util. Comm'n, Order at 54, *Application of Southwestern Electric Power Co. for Authority to Change Rates*, Docket No. 46449 (Jan. 11, 2018), 2018 WL 451698 (same).

portfolio resulted in a slight increase in SWEPCO's reliance on natural gas.[63] The Turk Plant is a long-term hedge against higher gas prices.

Second, the engineering work for the Turk Plant was 93% complete by June 2010 and overall plant construction was 39% complete. SWEPCO had commitments with its contractors to complete that construction. SWEPCO presented evidence demonstrating the company's commitments at that time. The Commission also heard testimony regarding the consequences of stopping construction in June 2010 and beginning work on a more costly alternative power supply.

By March 2009, SWEPCO had incurred $469 million in costs; any value from those expenditures would have been lost if SWEPCO abandoned construction. In addition, SWEPCO had $655 million in outstanding obligations dependent on completion of the plant. SWEPCO would have faced cancellation fees and litigation risk if it abandoned construction. By mid-year 2010, only $249 million of SWEPCO's projected $1.25 billion in costs remained uncommitted. Canceling the project could have posed costs that exceeded the remaining uncommitted amount to complete it and rendered any value from the capital expenditures to date essentially worthless. SWEPCO also challenged the Respondents' evidence favoring the abandonment of construction based on the merchant value of the plant as a stand-alone asset. It argued that such a valuation is not the correct metric for a plant that is part of an asset mix heavily invested in other energy

---

[63] SWEPCO's Director of Regulatory Services testified: "SWEPCO's generation mix in terms of capacity had been approximately 60% solid fuel and 40% natural gas for many years. However, due to the lower marginal cost of solid fuel, the Company's energy production was closer to 85% solid fuel and 15% natural gas. . . . With the inclusion of [the three new plants] the mix will change to approximately 54% solid fuel and 46% natural gas." SWEPCO also offered testimony from the Managing Director of Resource Planning and Operational Analysis for the American Electric Power Service Corporation: "The Turk Plant's role of balancing gas-fired generation becomes even more critical with the retirement of the Welsh 2 unit. In 2016, the relative percentage of overall SWEPCO generating capacity will be 46 percent gas-fired, 46 percent solid-fuel (coal and lignite) and 8 percent wind resources. Of particular note is that the 46 percent solid-fuel capacity make-up by 2016 will represent a fairly significant drop from the 60 percent mix of SWEPCO's generating capacity represented by solid-fuel facilities that existed back in 2006."

commodities, particularly if the utility operator is obligated by statute to continuously provide power.

Third, the Turk Plant's capacity met SWEPCO's power demands and had an anticipated useful life that extended beyond the current economic conditions in 2010. SWEPCO "had not made any additions to its fleet of power plants since 1986," and new resources were "necessary to meet the growth in customers' demand and in reliability needs." In 2005, SWEPCO's Integrated Resource Plan identified its long-term resource requirements based on anticipated peak load projections and minimum required capacity margins.[64] If SWEPCO did not increase its resources, it projected that it would have a capacity deficiency of 1,200 megawatts by 2012. SWEPCO submitted exhibits detailing and comparing demand forecasts that showed that SWEPCO's long-term capacity needs had not materially changed since the Commission had approved the Turk Plant. Retrofitting a different plant—as the administrative panel recommended—presented environmental challenges and would not have allowed SWEPCO to meet its predicted minimum capacity and reserve margins.

Much of the testimony that the Commission credited is undisputed. The parties instead dispute the weight to give that testimony in considering whether an investment decision is prudent among an array of options. The court of appeals evaluated the strength of the evidence differently from the Commission. But the overall assessment of investment policy considerations and the weight to give the evidence supporting them are within the Commission's province. That a court

---

[64] As a member of the Southwest Power Pool Regional Transmission Organization, SWEPCO is required to maintain a "Minimum Required Capacity Margin of 12 percent of installed capacity." Further, "[a]s a function of peak demand being projected" the minimum capacity margin "converts to an equivalent 'reserve margin' of 13.6 percent." The Organization requires utilities like SWEPCO to maintain adequate capacity reserves to manage demand spikes triggered by extreme weather.

might accord less weight to the testimony than the Commission did is not a basis to reverse the Commission's decision if some evidence supports it.

*       *       *

We hold that the Commission did not act arbitrarily in objectively evaluating whether a reasonably prudent utility manager could have decided, as SWEPCO did, to complete construction of the Turk Plant. Substantial evidence supports the Commission's conclusion that completion of the Turk Plant was within the range of reasonable options available to a prudent utility manager under the circumstances. Accordingly, we reverse the judgment of the court of appeals and remand the case for that court to consider the remaining issue on appeal.

_____
Jane N. Bland
Justice

**OPINION DELIVERED:** March 26, 2021